SHOP RITE FOODS, INC. and West Texas Warehouse Company, Appellants,

v.

The UPJOHN COMPANY, Appellee.

No. 9231.

Court of Civil Appeals of Texas, Amarillo.

June 10, 1981.

Second Motion Rehearing Denied July 15, 1981.

Whittenburg, Whittenburg & Schachter, Cary Schachter and R. Doak Bishop, Amarillo, for appellants.

Baker & Botts, Richard L. Josephson and Lee H. Gudel, Houston, Gibson, Ochsner & Adkins, Beau Boulter, Amarillo, for appellee.

## ON MOTION FOR REHEARING

DODSON, Justice.

We withdraw our former opinion handed down on 13 May 1981, and substitute this one in its place. In this opinion, we reach the same result and overrule the motion for rehearing.

In this product liability action, Shop Rite Foods, Inc. and West Texas Warehouse Company appeal from a take-nothing judgment rendered on a jury's verdict on their claims against the Upjohn Company. Concluding that the appellants' contentions on appeal do not show cause for disturbing the judgment, we affirm.

The appellants brought this action against Upjohn to recover damages resulting from a fire started in Upjohn's product used in a warehouse owned by West Texas Warehouse and leased to Shop Rite. As a result of the fire, the warehouse was damaged in the stipulated amount of $70,000.00 and Shop Rite's inventory, equipment and other items of personal property located therein were damaged in the jury-determined amount of $844,958.05.

The product in question is polyurethane foam. Upjohn made and marketed the product primarily for use as a roofing insulation material. However, in the spring of 1972, Shop Rite used the polyurethane foam on the interior walls and ceiling of a cold

storage vault it constructed in the warehouse. In September of 1973, a fire began in the cold storage area when Shop Rite's employees were using cutting or heating torches to thaw frozen water pipes.

In their action, the appellants allege, among other things, that under certain circumstances, the polyurethane foam is unreasonably dangerous for interior applications to walls and ceilings, that Upjohn failed to adequately warn them of such dangers in several aspects, and that the failure to warn was a producing cause of the fire. Shop Rite further alleges that Upjohn made a misrepresentation of a material fact concerning the character or quality of the polyurethane foam by using the phrases "fire retardant" or "self-extinguishing" in its sales promotional literature, that it justifiably relied on such misrepresentations and that such reliance was a producing cause of the fire. Conversely, Upjohn alleges several specific acts of misuse of the product on the occasion in question and that such misuses were a proximate cause of the fire.

In response to special issues with corresponding numbers the jury found: (1) that it was reasonably foreseeable by Upjohn that persons or property might be injured by the use of the product in interior applications on walls and ceilings without a 15 or 30 minute thermal barrier; but, (2) that Upjohn did not fail to warn the appellants of such danger; (5) that it was reasonably foreseeable by Upjohn that persons or property might be injured by using cutting or heating torches in contact with or in close proximity to the product; but, (6) that Upjohn did not fail to warn the appellants of such danger; (9) that it was reasonably foreseeable that persons or property might be injured by the propensity of the product, once ignited, to burn rapidly and intensely in interior applications on walls and ceilings; (10) that Upjohn failed to warn the appellants of such propensity; but, (11) that such failure to warn the appellants did not render the product unreasonably dangerous; and (13) that Upjohn did not make misrepresentations to Shop Rite concerning the character or quality of the product by using the phrases "fire retardant" or "self-extinguishing".

Concerning the alleged misuse of the product, the jury found, *inter alia*, that Shop Rite's employees exposed the product to the direct flame or intense heat of cutting torches, that such action was a misuse of the product, and that such misuse was a proximate cause of the fire; that it was a misuse of the product to expose it to the direct flame or intense heat of cutting torches without a protective shield at a time when neither the vault, its contents nor the product was protected by an automatic sprinkler system, and that such misuse was a proximate cause of the fire; and that either prior to or on the occasion in question, Shop Rite made such an alteration to the installation that the product was made susceptible to ignition when exposed to sparks and heat of torches, that such alteration was a misuse of the product, and that such misuse was a proximate cause of the fire.

By thirty-six points of error, the appellants, claim the judgment should be reversed and remanded for a new trial. In points two, four, six and eight, the appellants maintain they conclusively established each of the propositions asserted by the following special issues:

(2) that Upjohn failed to give them an adequate warning of the danger of the use of polyurethane foam in interior applications on walls and ceilings without a 15 or 30 minute thermal barrier; and

(6) that Upjohn failed to give them an adequate warning of the danger of the use of cutting or heating torches in contact with or in close proximity to the polyurethane foam.

In deciding the appellants' "conclusive" contentions, we must review the whole record to ascertain if the probative evidence establishes as a matter of law the asserted propositions. In this connection, the probative evidence must be sufficient to convince reasonable minds that there is no material fact issue concerning the asserted proposition; and, in a pragmatic effect, the

evidence must be sufficient to support a directed verdict, a judgment notwithstanding the jury's verdict or a summary judgment on the proposition. Conversely, each asserted proposition is for the fact-finder when the probative evidence in support of the proposition falls short of these legal standards or when there is any probative evidence contrary to the proposition.

■ In the court's charge, adequate warning is defined as follows:

By the term "adequate warning", as used herein, is meant such warning as would both:

(1) Be reasonably calculated to reach the users of the product in such a form that it would reasonably be expected to catch the attention of the reasonably prudent person in the circumstances of its use; and

(2) Be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person.

This definition is unchallenged and generally conforms with the accepted standards stated in *Lopez v. Aro Corp.*, 584 S.W.2d 333, 335 (Tex.Civ.App.—San Antonio 1979, writ ref'd n. r. e.), and *Bituminous Casualty Corp. v. Black & Decker Mfg. Co.*, 518 S.W.2d 868, 872–73 (Tex.Civ.App.—Dallas 1974, writ ref'd n. r. e.).

The evidence shows that Shop Rite built the cold storage vault in April or May of 1972 and insulated the vault with Upjohn's CPR 485 polyurethane foam. Shop Rite purchased the product from Kenneth Sanders who did business as Products Specialty Company. Upjohn sold the product to Products Specialty. Shop Rite's employee, Mike Probasco, negotiated the purchase of the product for Shop Rite with Kenneth Sanders. Sanders hired the John R. Hall Company to apply the product.

In essence, the appellants contend that they conclusively established the asserted "inadequate warning" propositions, because the evidence shows neither they nor their respective employees had direct written or verbal communications with Upjohn or its employees concerning the use of the product and that any written or verbal warning made to other persons by Upjohn was inadequate to reach them. The evidence does show that, prior to the sale and the fire, Upjohn had no direct contact with the appellants and that Upjohn and its employees had never heard of the appellants until the fire occurred. However, the evidence further shows that Upjohn disseminated information and warnings concerning the use of its product which were reasonably calculated to reach its direct customers and the product's ultimate users.

George Bir, Market Development Manager for Upjohn's CPR Division, testified that Upjohn had several methods of providing information and warning for the use of its product:

Q. Now, what steps did you and Upjohn Company at that time take to warn purchasers of your products, contractors, owners of buildings, and users, that they needed a fifteen or thirty minute thermal barrier to cover these products when used interiorly in buildings?

A. We used several methods and quite effectively to those that would listen, published literature, constant training programs, constantly verbalizing to all of our customers to all of the people that we could reach, constantly verbalized to our sales people. Our sales people constantly verbalized to their customers.

Q. Can you tell me specifically what literature you are referring to that contained those warnings?

A. Oh, I think you can find Sweet's [Architectural] Catalog even in the late '60s that will show you that you put a finish material on the interior application, and each year it is updated more specifically, but I don't think we ever showed an interior application without a finished wall system on it.

Upjohn's salesman, Ed Young, sold the product to Kenneth Sanders, who was Shop

Rite's supplier. In discussing his first contacts with Kenneth Sanders prior to the sale, Mr. Young testified:

Q. Did you ever give Kenneth Sanders any warnings about the dangers of using CPR 485 in interior applications?

A. Sure.

Q. What warnings did you give him?

A. Well, urethane foam is combustible, and if they are applied to the interior of a building they need to be isolated from the occupied area of the building with some method that would prevent them from burning.

.    .    .    .    .

Q. You knew that in 1972?

A. Oh, sure.

Q. O.K. Can you tell me what specifically you told Kenneth Sanders about that problem?

A. During that period of time we were talking in terms of thirty-minute thermal barriers.

Q. O.K. Now could you tell me what you were generally saying to the customers?

A. To all customers at that time we were talking about the fact that these materials were combustible.

Q. Uh-huh.

A. There had been some fires. We realized that these materials needed to be isolated from the occupied areas of buildings with some method of protecting the product from the inside environment. We talked at that time in terms of thirty-minute thermal barriers. We talked about the possibility that there were other methods of meeting the problem. We knew at that time that there were a number of people in the marketplace with various kinds of coating materials which they felt were appropriate for those kinds of applications. Some of these people, you know, collect literature and read the literature and be sure they were buying products and that they were applying products that were meant for the purpose that they were being applied.

\*    \*    \*    \*    \*    \*

Q. In 1972 were you informing your customers of the availability of these products and just advising them to just look at the products and literature associated with them?

A. Yes, I would say that I generally advised people to use a thirty-minute barrier material. They then in turn would come back and say 'what about all these other materials that are being sold as a—for protection of urethane'—and under those circumstances the remarks I just made were generally what I was telling people.

The testimony of Kenneth Sanders, who sold the product to Shop Rite, shows that he communicated the information concerning the use of the product to Mr. Probasco, Shop Rite's employee. Sanders said he tried to sell to Shop Rite Upjohn's CPR 425, a more heat resistant product than CPR 485, the product in question, plus a protective plywood barrier and an epoxy coating. However, Probasco declined, saying the installment would be too expensive. The evidence further shows that Sanders did not tell Probasco that "the material wouldn't burn," and that he did tell Probasco about a polyurethane fire that had started when some people were trying to cut through a metal building with a welding torch.

Thus, under the circumstances in this instance, we conclude that the appellants did not conclusively establish the propositions asserted in special issue numbers two and six; that there is probative evidence in support of and contrary to each asserted proposition and that each asserted proposition is for the jury to decide. Furthermore, in Texas, the sufficiency of the warning given is a question for the factfinder. *Lopez v. Aro Corp.*, 584 S.W.2d at 335. Accordingly, we overrule points of error two, four, six and eight.

By points ten and twelve the appellants contend that they conclusively established that the failure of Upjohn to adequately warn them of the propensity of the polyurethane foam, once ignited, to burn rapidly and intensely in interior applications on walls and ceilings rendered use of the insulation unreasonably dangerous. This is the proposition asserted in special issue number eleven to which the jury answered "it did not".

The evidence shows that polyurethane foam has a high heat release factor and that it will burn rapidly in some interior settings where there is limited air circulation. However, there is evidence that polyurethane is good insulation material; that it is combustible; that it will burn; that the applicator (John R. Hall Company) demonstrated to Shop Rite that the product would burn; that the product was applied to the walls and ceiling of the cold storage vault; that after the fire, two walls and the ceiling remained standing; that fire spread away from the product along the pine roof of the warehouse; that the warehouse was totally destroyed by the fire; that Shop Rite's employees applied cutting or heating torches to exposed polyurethane foam; that two-thirds of the warehouse sprinkler system was turned off by Shop Rite; and that there were no working fire extinguishers available in the warehouse.

Thus, under the circumstances, we conclude that the appellant did not conclusively establish that Upjohn's failure to warn them of the propensity of the polyurethane foam, once ignited, to burn rapidly and intensely in interior applications on walls and ceilings rendered use of the product unreasonably dangerous. Under the evidence, the jury could have found that Shop Rite created the unreasonably dangerous condition other than through use of the product. Accordingly, we overrule points ten and twelve.

By the fourteenth point of error, Shop Rite maintains that it conclusively established that on or before the date of the sale of the polyurethane foam to it, Upjohn made a misrepresentation of a material fact concerning the character or quality of the polyurethane foam by using the phrases "fire retardant" or "self-extinguishing". With their sixteenth point, the appellants claim they conclusively established that the management of Upjohn deliberately decided to manufacture and market the product "by use of the phrases 'fire retardant' or 'self-extinguishing' when it knew the product was neither." These propositions were contained in special issues thirteen and thirty-two(c) and the jury answered those issues adversely to Shop Rite.

The appellants maintain that they conclusively established the asserted propositions because Upjohn's technical information sheet on the product used the phrases "self-extinguishing" and "fire retardant" and the evidence shows that the product was flammable and would burn. The evidence shows that Kenneth Sanders showed the technical information sheet to Mr. Probasco, but that Probasco did not read the information. The evidence further shows that the technical information sheet referred to the use of the product as insulation material for roofing rather than for an interior application; that the product has fire resistant properties; that it has less fire resistance properties than CPR 425; that Probasco knew such fact; and that the applicator of the product demonstrated to Shop Rite that the product would burn.

George Bir of Upjohn testified concerning the technical information sheet as follows:

Q. Let me show you what has been marked as Exhibit—Plaintiff's Exhibit SR 17. Now, that is a technical information sheet on CPR 485, isn't it?

A. Yes, sir, dated February 1971.

Q. Yes, sir. And would you look at the second page of that? Does it say up there that CPR 485 is a fire retardant foam?

A. Yes, sir, it does. "Fire retardant fluorocarbon-blown rigid urethane spray foam designated specifically as a major component of a UL listed roof insulation."

Q. At the time that the Technical Information Sheet was published in February 1971, you knew and the Upjohn Company knew that that type of foam would not retard fires in actual or real fire situations?

A. The statement is a total statement and not to be taken out of context by a word or a word or two. It was then and still is a fire retardant fluorocarbon-blown rigid urethane spray.

Q. But you knew at that time and Upjohn knew that it would not retard fires in an actual or real fire situation at the time—

A. Nothing to do with the statement being in there.

Q. I'm sorry?

A. Your question has nothing to do with the word being couched in the entire statement.

Q. My question—

A. The material is chemically fire retardant, it is a fact.

Q. Did you know what they [the chemists] meant by it being a fire retardant foam?

A. It had fire retardant chemicals in it, is what he meant, and on a relative basis to the millions of the urethane formulations that are available then and now in the United States, it is. In the context of the millions of urethane systems available then in the United States it was fire retardant on the relative basis.

He further stated:

Q. Does that document identified as Exhibit 5 describe CPR 385 [485] to be self-extinguishing?

A. *Yes, sir, with a footnote that says not to be considered or used as a fire hazard classification.*

Q. Uh-huh. But the answer is yes it does?

A. The answer is as I gave, yes, sir.

(Emphasis added).

Thus, the evidence shows that the technical information sheet describes the product as a component of a UL listed roof insulation, and that a footnote to that information states "that the phrases used on the information sheet are not to be considered as a fire hazard classification." Accordingly, under the record, Shop Rite did not conclusively establish the propositions asserted in special issues thirteen and thirty-two(c). Thus, we overrule the fourteenth and sixteenth points of error.

In points one, three, five, seven, nine, eleven, thirteen and fifteen, the appellants contend that the jury's answers to special issue numbers two, six, eleven, thirteen and thirty-two(c) are against the great weight and preponderance of the evidence. In deciding these points of error, we must consider all of the evidence in support of and contrary to each challenged finding to ascertain if such findings are so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *Parrish v. Hunt*, 160 Tex. 378, 331 S.W.2d 304, 305–06 (1960); *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam). Having done so, we conclude that the jury's answers to special issue numbers two, six, eleven, thirteen and thirty-two(c) are not so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. Accordingly, we overrule points of error one, three, five, seven, nine, eleven, thirteen and fifteen.

By points nineteen through thirty-four the appellants maintain that the judgment should be reversed and the action remanded for a new trial because of jury misconduct. In this connection they allege the jury committed four acts of misconduct by discussing and considering or suggesting:

(1) that Upjohn would not have marketed the polyurethane foam unless it met federal government guidelines because there was no such evidence;

(2) that Carroll Stephens should be part of Upjohn for the purpose of giving

warnings to Shop Rite because there was no such evidence;[1] (3) that the definition of "misuse" as used in the court's charge was confusing and should be disregarded, and that each juror should rely upon his own individual understanding of the meaning of that term; (4) that any failure to warn by Upjohn could not make the polyurethane unreasonably dangerous because it did not change the physical composition of the product.

The trial court held an evidentiary hearing on the alleged jury misconduct. In its order overruling the appellants' motion for a new trial, the court specifically found that "no misconduct occurred during the jury's deliberation." By their points of error, the appellants maintain that they conclusively established each alleged act of misconduct and probable harm therefrom; and that the trial court's failure to so find is against the great weight and preponderance of the evidence.

The jury deliberated for two full days over a three-day period. The jury's verdict was made by ten of the twelve jurors. Only two of the jurors testified at the evidentiary hearing. A juror who had dissented from the verdict said the alleged acts occurred during the deliberations. The other juror had signed the verdict and testified that the deliberations were long and hard, that there was a lot of discussion, that the jury followed the court's charge, and that the foreman read and reread the issues and instructions at least one hundred times. This juror's testimony on the alleged acts of misconduct contradicted the dissenting juror's testimony.

It is settled that the party complaining about jury misconduct has the burden to prove the overt act of misconduct, that it was material misconduct, and "from the record as a whole, that injury probably resulted." *Fountain v. Ferguson*, 441 S.W.2d 506, 507 (Tex.1969), *cert. denied*, 396 U.S. 959, 90 S.Ct. 433, 24 L.Ed.2d 424 (1969). Furthermore, whether jury misconduct occurs is a question of fact, but whether injury probably resulted therefrom is a question of law for the court. *City of Houston v. Quinones*, 142 Tex. 282, 290, 177 S.W.2d 259, 263 (1944); *Reese v. Brittian*, 570 S.W.2d 528, 532 (Tex.Civ.App.—Amarillo 1973, writ ref'd n. r. e.).

In determining whether overt acts of misconduct occurred, the trial judge is properly dominant. He observed the witnesses, heard their testimony, and is in the best position to evaluate the evidence and draw the correct factual conclusion. The trial court has considerable latitude in granting a new trial for jury misconduct and its refusal to grant a new trial upon an expressed or implied finding that no jury misconduct occurred is ordinarily binding on the reviewing court and will be reversed only where a clear abuse of discretion is shown by the complaining party. *Texas v. Wair*, 163 Tex. 69, 351 S.W.2d 878 (1961) (per curiam); *Costin v. Bosworth*, 328 S.W.2d 235, 236 (Tex.Civ.App.—El Paso 1959, no writ). Applying these principles to the record before us, we must conclude that the trial court did not abuse its discretion by finding that no jury misconduct occurred. Accordingly, points of error nineteen through thirty-four are overruled.

With the seventeenth and eighteenth points, the appellants contend that the judgment should be reversed because the trial court refused to make requested findings of fact and conclusions of law concerning jury misconduct. In this connection, the trial court may make expressed findings of fact and conclusions of law concerning jury misconduct. *See* 3 R. McDonald, Texas Civil Practice sec. 14.16.2, p. 576 (rev. 1970). However, the trial court cannot be compelled to do so by a request. *See Warner v. Plummer*, 355 S.W. 2d 817, 818 (Tex.Civ.App.—Waco 1962, writ ref'd n. r. e.), and authorities cited therein. Fur-

---

1. Mr. Stephens, as an employee of the John R. Hall Company, was the applicator of the product.

thermore, nothing exists in the record to indicate that the requests or complaints for failure to file findings of fact and conclusions of law were ever presented to the trial court. As stated in *Lassiter v. Bliss*, 559 S.W.2d 353 at p. 358 (Tex.1977):

> There being nothing in the record to show that the request or complaint was ever presented to the trial judge, there is no reversible error in failing to file the findings of fact and conclusions of law.

Accordingly, we overrule the seventeenth and eighteenth points of error.

In the thirty-fifth and thirty-sixth points of error, the appellants claim that the judgment should be reversed "because there is a material, irreconcilable conflict between the jury's answers to special issues 2 and 32(b)." Special issue number two was conditionally submitted in relation to special issue number one. In response to special issue number one the jury found that it was reasonably foreseeable by Upjohn that persons or property might be injured by the use of the product in interior applications on walls and ceilings without a 15 or 30 minute thermal barrier. However, in response to special issue number two, the jury found that Upjohn did not fail to warn the appellants of such danger.

In response to special issue number thirty-two(b) the jury found that Upjohn deliberately made the decision to manufacture and market the polyurethane foam without giving an adequate warning of the risk created by use of the product in interior applications on walls and ceilings without a 15 or 30 minute thermal barrier; but that such action was not taken "in conscious disregard of the safety of the ultimate users of the polyurethane foam"; and that such action was not a proximate cause of the fire in question.

At the outset, we notice that the answers to issues two and thirty-two(b) do not present the traditional irreconcilable conflict which exists when the answer to one issue would establish a cause of action or defense while the other would destroy it. *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985, 991 (1949). Fur-

thermore, when a party relies on one of several alternative theories of recovery or defenses and the jury's answers to such theories are seemingly inconsistent or illogical, there is no fatal conflict in the verdict in the absence of some other finding which would require a different judgment. *See M. C. Winters, Inc. v. Lawless*, 445 S.W.2d 761, 765 (Tex.Civ.App.—Eastland 1969, writ ref'd n. r. e.); 3 R. McDonald, Texas Civil Practice sec. 15.06.3, p. 610 (rev. 1970).

Moreover, the jury's answers to issues two and thirty-two(b) are consistent with one view of the evidence. The record shows that Upjohn began manufacturing and marketing the product in question in the early 1960's as an exterior roofing insulation material. In 1971 or 1972, Upjohn became aware that the product was being used in interior settings and began warning its customers of the need for a 15 or 30 minute thermal barrier. Shop Rite purchased the product in the spring of 1972. Thus, the jury's answers to issues two and thirty-two(b) are reasonably reconcilable. When there is an apparent conflict or an inconsistency in the jury's answers which can be reasonably reconciled, it becomes our duty to do so. *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 195 (Tex.1966). Accordingly, we overrule the thirty-fifth and thirty-sixth points of error.

In summary, we overrule the appellants' thirty-six points of error. The judgment of the trial court is affirmed.

### ON APPELLANTS' SECOND MOTION FOR REHEARING

In its second motion for rehearing, Shop Rite points out certain typographical errors in our opinion: (1) In the only paragraph on page 6 of the opinion, we erroneously referred to CPR 425 foam as "CPR 482" foam; and (2) In the first paragraph on page 2, the second paragraph on page 4, and first paragraph on page 14, we erroneously stated that Shop Rite purchased its polyurethane foam in the spring of 1973, instead of the spring of 1972. In the interest of accuracy we have corrected the opinion for pub-

lication. Copies of the corrected pages are attached hereto and transmitted to the recipients of the opinion.

Nevertheless, after reviewing Shop Rite's Second Motion for Rehearing, we are of the opinion that it should be overruled. We therefore overrule Shop Rite's Second Motion for Rehearing.