**GENERAL MOTORS CORPORATION,**
Appellant,

v.

**Maria G. SAENZ, in Behalf
of Her Minor Children,
et al., Appellees.**

No. 13–90–072–CV.

Court of Appeals of Texas,
Corpus Christi.

Nov. 27, 1991.

Opinion on Motion for Rehearing
April 30, 1992.

Second Rehearing Overruled
May 28, 1992.

Charles W. Hury, Atlas & Hall, McAllen, Royal H. Brin, Jr., Strasburger & Price, Dallas, for appellant.

Victor M. Carrera, Munoz, Hockema & Reed, McAllen, Phil Harris, Weslaco, Thomas O. Matlock, Jr., Mission, Ramon Garcia, Felipe Garcia, Jr., Law Offices of Ramon Garcia, Jr., Edinburg, for appellees.

Before NYE, C.J., and HINOJOSA and SEERDEN, JJ.

## OPINION

HINOJOSA, Justice.

General Motors Corporation (GM) challenges a jury verdict finding it liable under theories of strict liability and negligence for failing to adequately warn users against overloading a GM truck cab and chassis. The key issues concern whether the truck's subsequent modification exonerates GM from liability. We affirm.

GM manufactured and sold a Chevrolet C–50 cab and chassis in 1972. The truck was sold bare, without a body. After the sale, the buyer installed an apparatus designed for towing trucks. The truck served this purpose for fifteen years.

The towing equipment was dismantled and the truck was sold to Sascon, a paving company. Sascon placed a 2000 gallon water tank on the truck chassis and made other modifications. The tank was so large and installed so high over the chassis, that when it was fully loaded, the truck's weight exceeded its rated gross vehicle weight and its center of gravity was dangerously high.

When the truck was sold to Sascon, the owner's manual was in the glove box and a metal plate noting the truck's gross vehicle weight was attached to the door. Sascon employees did not consult either the owner's manual or the door plate before adding the tank. Sascon's owner testified that he would not have installed such a large tank had he been adequately warned against overloading the truck.

Other modifications were made, and the truck was then sold to Cantu Lease, another paving company. Cantu Lease filled the water tank either partially or completely full with water, exceeding the truck's gross vehicle weight. Josue Ramirez and Ricardo Saenz were instructed to drive the truck to a job site. While travelling at highway speeds, one of the truck's two right rear tires experienced a severe blowout. The other tire rapidly lost inflation, and Saenz lost control. Because the truck was overloaded, it became unstable and rolled. Both drivers were thrown from the truck and died of their injuries.

At trial, appellees argued that GM was both negligent and strictly liable for the injuries caused by the accident because it failed to clearly and adequately warn Sascon not to improperly modify the truck, and

GM failed to warn Cantu Lease and the ultimate users not to overload the truck. The jury found GM liable for 70% of the damages under negligence and strict products theories, and Sascon liable for the remainder. Damages totalling $4,784,447.06 in addition to ad litem fees and post-judgment interest were assessed. GM appeals by eleven points of error.

■ In GM's first point of error it asserts it had no duty to warn because it could not foresee that a water tank would be placed on the truck. GM argues that Sascon, and not GM had the duty to warn because the truck was substantially modified by Sascon. In support of its arguments, GM relies upon *Verge v. Ford Motor Co.*, 581 F.2d 384 (3rd Cir.1978), *Elliott v. Century Chevrolet Co.*, 597 S.W.2d 563 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.), and *Trevino v. Yamaha Motor Co.*, 882 F.2d 182 (5th Cir.1989).

Appellee argues that GM had a duty to warn both the ultimate users and Sascon because the dangers of overloading and high center of gravity were foreseeable for all uses of the cab and chassis.

In *Verge*, a truck manufacturer built and sold a bare cab and chassis. A second-stage manufacturer converted it into a garbage truck. In this configuration the rear window was blocked. The plaintiff, who was injured when the truck backed into him, sued the truck manufacturer and the second-stage manufacturer (modifier) alleging strict liability. *See* Restatement (Second) of Torts § 402A. The second-stage manufacturer settled and the plaintiff went to trial against the truck manufacturer. He alleged that the truck was defectively designed because it did not include a back-up buzzer. The jury found for the plaintiff, and the manufacturer appealed.[1]

The Third Circuit considered the problem presented by these facts as one of allocation of responsibility between the two manufacturers. The Court developed a three part test for allocating responsibility, and held that Ford was not responsible as a matter of law for failing to install a back up buzzer. The court reasoned that for many, if not most, uses of the chassis the backup buzzer was not necessary. The Court concluded that it was not feasible for Ford to install a backup buzzer on every truck, and held the second stage manufacturer was responsible for this defect. The *Verge* court specifically limited this holding to the facts. *Id.* at 389.

In *Trevino* the Fifth Circuit, following *Verge* and *Elliott*, affirmed a summary judgment against the plaintiff. The evidence in *Trevino* indicated that the cause of the injuries was the plaintiff's pants leg became caught in a latch protruding from a "pickup-type body" installed by a second-stage manufacturer, and not Yamaha. Plaintiff claimed Yamaha had a duty to warn against the defect.

The court held that Yamaha was not responsible for the defect which caused the injury, and affirmed summary judgment.

*Verge, Elliott*, and *Trevino*, are distinguishable. Additions to the bare cab and chassis were not only foreseeable, but expected. Almost every foreseeable modification of the GM chassis at issue involved carrying heavy loads. An adequate warning regarding loading was therefore necessary for almost every use.

Unlike *Trevino*, in which the evidence showed that the injury was caused exclusively by a protruding latch installed by a second-stage manufacturer, the evidence here shows that a cause of the injury was GM's failure to warn.

Thus, these decisions are factually distinguishable.[2] However, more significant than the factual distinctions between this case and *Verge*, are the legal distinctions. Our decision today is guided not by a three part test developed in the Third Circuit, but rather by traditional legal principles gov-

---

**1.** In *Elliott,* the Fort Worth Court affirmed a summary judgment on almost identical facts.

**2.** We question whether these decisions accurately reflect the law in Texas, particularly as applied in negligence cases. These decisions do not incorporate the foreseeability of injury as a basis of liability. Rather, they rely on a three part test composed of factors more properly weighed by Texas juries.

erning liability in negligence and strict liability for failure to warn.

When GM's arguments are analyzed under these principles, it is apparent that it had a duty to adequately warn Sascon and the ultimate users of the risks associated with overloading and high center of gravity.[3] The general rule in Texas is that duty in negligence is based primarily on foreseeability of risk: "The risk reasonably to be perceived defines the duty to be obeyed." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 526 (Tex.1990) (quoting *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 100 (1928).[4] Whether a duty exists is a question of law for the court.

■ Under negligence and strict products liability theories, the manufacturer's duty is to adequately warn a product's users of foreseeable risks. The specific question to be answered in this case is whether it was foreseeable that persons would be injured due to overloading and the resulting instability of the C–50 cab and chassis.

The evidence showed that it was foreseeable that overloading of this truck could cause injuries. This truck was designed and built to carry particular loads, approximately 8000 pounds. The component parts of the truck were also designed to meet specific weight limitations, but not to perform well over those limitations. The evidence also showed that when overloaded the truck became dangerous, particularly when driven at highway speeds. The truck was safe to operate below certain weight limits, but not over them. Therefore, GM had a duty to adequately warn all users not to exceed these weight limits.

Texas law also provides that a manufacturer has a duty to warn of known risks associated with a product's use. These risks include hazards of which the manufacturer should have known and actually knew.[5]

The evidence indicated that GM was actually aware of the risks associated with overloading and the truck's high center of gravity. The owner's manual stated: "Overloading can create serious potential safety hazards...." and, "Care should also be exercised to see that the payload is distributed on both sides of the center line of the truck as equally as possible." The door plate also indicated that loading was important. This evidence showed that GM knew the truck would become dangerous when overloaded, and that this could cause serious injury. Therefore GM had a duty to warn users of these risks because it was actually aware of the dangers of overloading.

■ If it is foreseeable that a product will be modified, a manufacturer has a

---

3. We note that the duty to warn is identical under both strict liability and negligence theories. *See* Sales, The Duty to Warn and Instruct for Safe Use in Strict Tort Liability, 13 St. Mary's L.J. 521, 543–47 (1982); Annotation, Failure to Warn as a Basis of Liability Under the Doctrine of Strict Liability in Tort, 53 A.L.R.3d 239, 246 (1973). Foreseeability is fundamental under both theories.

4. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987); *Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex.1984); *see generally*, Keeton, PROSSER AND KEETON ON TORTS, 169–73 (5th ed. 1984) (discussing the importance of foreseeability).

5. *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 591 (Tex.1986) (actual knowledge); *Bristol–Meyers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex.1978) (if a manufacturer knows of, or should know of potential harm to a user because of the nature of its product, the manufac-

turer is required to give an adequate warning of such dangers); *Brune v. Brown Foreman Corp.*, 758 S.W.2d 827 (Tex.App.—Corpus Christi 1988, writ denied); *Olivarez v. Broadway Hardware, Inc.*, 564 S.W.2d 195, 201 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); Restatement (Second) of Torts § 388(c) (1965). In *Alm*, the Supreme Court of Texas focused on the manufacturer's actual knowledge of the risk of injury:

> Alcoa supplied a capping machine to JFW. Alcoa knew that through use its capping machine would go out of adjustment, thereby causing misapplied caps. And Alcoa knew of the risk of personal injury from bottle cap blow off at least as early as 1970. Alcoa had a duty to warn users of the hazard of improperly applied caps.

*Alm*, 717 S.W.2d at 591. As the *Alm* court recognized, actual knowledge of a dangerous condition associated with a product's use is an independent basis for establishing the duty to adequately warn. *See also Bristol–Meyers Co.*, 561 S.W.2d at 804; *Brune*, 758 S.W.2d at 827.

duty to adequately warn of known and foreseeable dangers associated with such modifications. "[A] seller is subjected to liability if he introduces into the channels of commerce a non-defective product that he can anticipate will undergo change and become unreasonably dangerous if the seller does not warn the consumer or user of such danger." *Hamilton v. Motor Coach Indus., Inc.,* 569 S.W.2d 571, 575–6 (Tex. Civ.App.—Waco 1978, no writ); *see Sharp v. Chrysler Corp.,* 432 S.W.2d 131, 136 (Tex.1968) (if anticipated change causes product failure defective product is established); *Bell Helicopter Co. v. Bradshaw,* 594 S.W.2d 519, 529 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

The evidence indicates that only a bare cab and chassis was produced and sold. Thus, modifications were foreseeable and indeed expected.

This truck was capable of modification allowing it to carry a load exceeding design limitations. When the truck was operated with loads exceeding these weight and loading limitations it became unstable. Injury due to overloading was therefore foreseeable. The foreseeability of the truck's subsequent modification and the resulting risk of injury created a duty for GM to adequately warn Sascon not to modify the truck so that it could carry a load heavier than its design limitations.

■ We hold that a manufacturer has a duty under strict liability and negligence to adequately warn users of foreseeable risks and known risks associated with a product's use. If modifications are intended or foreseeable, the manufacturer has a duty to warn modifiers not to alter the product in a foreseeably dangerous manner. As applied to this case, GM had a duty to warn users of the risks of injuries caused by overloading and the truck's center of gravity characteristics. GM also had a duty to warn modifiers not to improperly modify the truck.

■ With the scope of GM's duty to adequately warn clearly defined, we now address an additional issue, which is whether Sascon's subsequent modifications eliminated GM's duty to warn. *Trevino,* 882 F.2d 184–6.

■ Unlike *Trevino,* the cause of the accident was not solely due to the actions of the modifier, but also due to the actions of GM in failing to adequately warn. In Texas, modification is considered a type of product misuse. *See Placencio v. Allied Indus. Int'l, Inc.,* 724 S.W.2d 20, 22 (Tex. 1987); *General Motors Corp. v. Hopkins,* 548 S.W.2d 344 (Tex.1977). Under the comparative causation scheme established by the Supreme Court in *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (1984), plaintiff and third party misuse which are concurring causes of the injury are aspects of fault the jury must allocate between responsible parties. *Id.* at 428. *Duncan* abolished absolute defenses in negligence and strict liability such as those proposed by GM here. Thus, substantial modification which is not a sole cause of the injury does not bar GM's liability. Here, the jury properly apportioned responsibility between GM and Sascon as *Duncan* requires.

GM had a duty under strict liability and negligence theories to adequately warn both the ultimate users and intermediate manufacturers of the truck's loading and center of gravity characteristics. Sascon's modification presents no reason to alter GM's responsibility to properly warn of the risks associated with its product. GM's first point of error is overruled.

■ By its second point of error, GM argues that the evidence is legally and factually insufficient to support the jury's apportionment of responsibility as 70% for GM and 30% for Sascon. We disagree.

■ A "no evidence" or "insufficient evidence" point is appropriate if the party without the burden of proof challenges a finding of fact. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). The scope of review for a no evidence point encompasses all the evidence and reasonable inferences which tend to support the finding of fact or jury verdict, and no other evidence. *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990). The no evidence standard of review requires us to overrule the point if,

viewing the evidence and inferences in the light most favorable to the finding, there is any evidence of probative force to support the finding. *Id.* On the other hand, the scope of review for an insufficient evidence point encompasses all the evidence which supports and contradicts the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). The insufficient evidence standard requires us to sustain this point only if the evidence supporting the finding is so weak, or so against the great weight and preponderance of the evidence that it is manifestly wrong and unjust. *Id.*

Under the comparative causation scheme set forth in *Duncan,* the jury had the duty to apportion responsibility between Sascon and GM. The evidence showed that both were partially responsible for the accident. Sascon negligently installed an oversized water tank on the truck, and did not warn Cantu Lease or the other users not to completely fill the tank and drive the truck at highway speeds.

GM failed to adequately warn Sascon of the truck's loading and center of gravity characteristics. The evidence showed that if Sascon had received an adequate warning from GM, Sascon would not have installed the tank. GM also failed to adequately warn Cantu Lease and the deceased drivers of the risks associated with driving an overloaded truck at highway speeds. GM was actually aware that the truck was dangerous when overloaded, yet it failed to adequately warn. An adequate warning could have been placed in every truck made for pennies per vehicle. We hold this evidence is legally and factually sufficient to uphold the jury verdict apportioning liability 70% to GM and 30% to Sascon. GM's second point of error is overruled.

▮▮▮▮ GM's third point of error challenges the legal and factual sufficiency of the evidence supporting the jury's finding that GM's failure to adequately warn was a proximate or producing cause of the accident. Appellees presented two theories of causation: that GM's failure to adequately

warn 1) Sascon and 2) the ultimate users, was a cause of the accident.

▮▮▮▮ The jury found that GM's failure to adequately warn Sascon and the ultimate users was a proximate and producing cause of the injury. Proximate cause, an essential element in a negligence case, is defined as cause in fact and foreseeability. Producing cause, an element in a strict liability cause of action, is established by proof that the defendant's actions or inactions were a cause in fact of the injury.

The evidence showed that GM's failure to adequately warn was a cause of the injury. Herman Skloss, Sascon's owner, testified that if he had received an adequate warning regarding the truck's loading and center of gravity characteristics, he would not have installed the oversized water tank on the truck. Expert testimony also showed that it was foreseeable that GM's failure to adequately warn would cause an accident, and that it actually was a cause of the accident. This evidence, measured by the well established legal and factual sufficiency standards, is sufficient to sustain the jury's findings that GM's failures to warn were proximate and producing causes of the accident.

▮▮▮▮ If a manufacturer fails to provide an adequate warning, a presumption arises that the failure to warn is a cause of the accident. *See Magro v. Ragsdale Bros., Inc.,* 721 S.W.2d 832, 834 (Tex.1986) (if a manufacturer fails to give adequate warnings or instructions, a rebuttable presumption arises that the user would have read and heeded such warnings or instructions); *Technical Chemical Co. v. Jacobs,* 480 S.W.2d 602, 606 (Tex.1972). This presumption is rebutted by proof of the users' intoxication, illiteracy, or other circumstances indicating that improper use would have occurred despite an adequate warning. *Magro,* 721 S.W.2d at 834. *Technical Chemical,* 480 S.W.2d at 606.

GM adduced no such evidence rebutting the presumption that its failure to adequately warn Sascon, Cantu Lease, and the drivers was a cause of the accident. Thus, these theories of causation are established

under negligence and strict liability theories as a matter of law. GM's third point of error is overruled.

■■ In GM's fourth point of error it argues that the evidence is legally and factually insufficient to sustain the jury's verdict finding the warnings inadequate.

■■ The adequacy of a warning is a question of fact for the jury. *Alm*, 717 S.W.2d at 592. In Texas, the legal definition of an adequate warning is a warning given in such form that (1) it could reasonably be expected to catch the attention of the reasonably prudent person in the circumstances of its use; and (2) its content must be comprehensible to the product's average user and convey a fair indication of the nature and extent of the danger, if any, and how to avoid it. *See General Chem. Co. v. Gonzalo De La Lastra*, 815 S.W.2d 750 (Tex.App.—Corpus Christi, 1991, n.w.h.); *Shop Rite Foods, Inc. v. Upjohn*, 619 S.W.2d 574, 578 (Tex.Civ. App.—Amarillo 1981, writ ref'd n.r.e.); *Bituminous Casualty Co. v. Black & Decker Mfg. Co.*, 518 S.W.2d 868, 873 (Tex.Civ. App.—Dallas 1974, writ ref'd n.r.e.). A warning's adequacy depends upon the language used and the impression it is calculated to make upon the mind of the average user of the product. *See Bituminous Casualty Co.*, 518 S.W.2d at 873. An adequate warning also warns with the "degree of intensity" to cause a reasonable person to exercise care as the risk requires. *See id.; See also Duty to Warn*, 13 St. Mary's L.J. at 559–66 (factors to be considered in determining whether a warning is adequate include: the conspicuousness and location of the warning, whether symbols or words were used, whether the warning clearly and unambiguously conveyed the risk of harm, and whether it was sufficiently broad and encompassing).

GM provided the following information on the door plate:

GENERAL MOTORS CORPORATION

WARRANTY MAY BE VOIDED IF WEIGHT EXCEEDS ANY OF THE RATINGS SHOWN

Gross vehicle weight includes weight of base truck, all added equipment, driver and passengers, and all property loaded into truck.

\* Refer to owner's manual for equipment required for intermediate or maximum GVW ratings and for other loading information including tire inflation.

Ratings in Pounds

| | As Manufactured | *Maximum Capability |
|---|---|---|
| Gross Vehicle Weight for this vehicle | 16000 | 24000 |
| Maximum Front End Weight at Ground | 05000 | 07000 |
| Maximum Rear End Weight at Ground | 11000 | 17000 |
| Vehicle Ident. No. | CCE532V105823 | |

The owner's manual provided in pertinent part:

IMPORTANT INFORMATION ON VEHICLE LOADING OVERLOADING SAFETY CAUTION

The weight of the payload must be properly distributed over both the front and rear axles, although not necessarily evenly. The plate shows the maximum weight that the front axle can carry and the maximum weight that the rear axles can carry. Note that the sum of these may be greater than the GVW, so that it is not necessarily proper to load both axles at the same time to the maximum capacity shown for each.

The GVW rating represents the weight that the complete vehicle is designed to carry taking into consideration the engine, transmission, frame, spring and tire capabilities. Actual front and rear end weights at the ground can only be determined by weighing the vehicle. This can be accomplished through highway weight stations or other such commercial facilities. For assistance in this regard, consult your local Chevrolet dealer. Care should also be exercised to see that the payload is distributed on both sides of the center line of the truck as equally as possible.

The components of your truck are designed to provide satisfactory service if

the vehicle is not loaded in excess of either the gross vehicle weight, or the maximum front and rear end weights, specified on a permanent plate which is attached to the cab left door pillar. Overloading can create serious potential safety hazards and can also shorten the service life of your vehicle. Your local Chevrolet Dealer can advise you concerning the proper loading conditions of your vehicle. The use of selected heavier suspension components for added durability purposes does not increase the weight rating stamped on the GVW plate.

The evidence supported the jury's determination that this information was not an adequate warning in a number of respects. First, no information indicates the truck's maximum safe center of gravity for a particular load. Thus, the alleged warning was completely deficient in this respect. Furthermore, the door plate did not clearly state how much payload the truck could carry. Even the experts disagreed about which weight rating listed on the door plate applied to the truck. The language also did not state the danger, *i.e.* the risk of rolling due to overloading; rather it suggested that the warranty would be voided if overloading occurred. Moreover, it did not express this danger in bold type or set cautionary language apart from the boilerplate.

We hold the evidence legally and factually sufficient to sustain the jury's finding that the warning was inadequate under both negligence and strict liability theories. GM's fourth point of error is overruled.

■ GM's fifth point of error complains that the evidence is legally and factually insufficient to support the jury's finding of gross negligence. The jury found that GM was grossly negligent and awarded the plaintiffs $2.5 million in punitive damages.

■ Gross negligence is defined as "that entire want of care which would raise the belief that the act or omission complained of was the result of conscious indifference to the right or welfare of the person or persons to be affected by it." *Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 572 (Tex.1985) (citing *Burk Royalty v.*

*Walls*, 616 S.W.2d 911, 922 (Tex.1981)). The test for gross negligence is both objective and subjective. It is established by proof that the defendant either actually knew that his or her conduct created an extreme degree of risk, or that a reasonable person would have known that his or her conduct created such risk. *Williams*, 699 S.W.2d at 573.

The jury found that GM's conduct was the result of conscious indifference to the plaintiff's rights. It awarded exemplary damages to provide an example to others and a penalty or punishment for such conduct.

The evidence showed that GM was aware that the truck's loading and center of gravity characteristics were crucial to its stability. Yet, GM completely failed to provide any warning regarding the truck's maximum center of gravity. GM also failed to provide an adequate warning regarding the weight the truck could carry. Moreover, GM failed to provide these crucial warnings to any of the relevant parties in the marketing chain, including the ultimate users. The cost of providing these warnings would have been pennies per vehicle. From this evidence, the jury could, and did, properly infer that GM was grossly negligent. *See Burk Royalty*, 616 S.W.2d at 922–23. Applying the correct legal and factual sufficiency standards, this evidence is sufficient to support an award of exemplary damages. GM's fifth point of error is overruled.

■ GM's sixth point of error raises a constitutional challenge to the procedure for awarding exemplary damages followed in Texas. Recent decisions have clarified the nature of Due Process protections against excessive punitive damages afforded by the Fourteenth Amendment to the United States Constitution. *Pacific Mut. Life Ins. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *Eichenseer v. Reserve Life Ins.*, 934 F.2d 1377 (5th Cir. 1991). A two-step analysis is presently required to determine whether a particular award of exemplary damages violates the Due Process Clause. First, the court must

determine whether there are sufficient circumstances supporting the reasonableness of an award of punitive damages. Second, the court must determine whether adequate legal and procedural constraints were imposed on the factfinder's discretion to impose such awards. *Eichenseer*, 934 F.2d at 1381.

In the instant case, our review of the circumstances supporting the award of punitive damages replicates the well-known legal and factual sufficiency analysis of the evidence supporting the award. *Eichenseer*, 934 F.2d at 1382. We have reviewed the evidence and found it sufficient. Therefore, we hold that there are sufficient circumstances supporting the reasonableness of the punitive damage award.

■ We next address whether the procedure followed in the instant case meets Due Process standards. *See Haslip*, —— U.S. at ——, 111 S.Ct. at 1044–46; *Eichenseer*, 934 F.2d 1382. Texas procedure for awarding punitive damages tracks the common-law method that has been approved by the Supreme Court. *Haslip*, —— U.S. at ——, 111 S.Ct. at 1042–43 (citing, among other cases, *Day v. Woodworth*, 13 How. 363, 14 L.Ed. 181 (1852)). Appellate courts in Texas have repeatedly approved Texas procedure in the face of Due Process challenges. *Bard v. Charles R. Myers Ins. Agency*, 811 S.W.2d 251, 263 (Tex.App.—San Antonio 1991, *writ granted*); *State Farm Mut. Auto Ins. Co. v. Zubiate*, 808 S.W.2d 590, 602–05 (Tex.App.—El Paso 1991, *writ denied*).

Texas procedure for assessing punitive damages involves properly instructing the jury regarding when punitive damages may be awarded. If the jury finds, under the applicable standards, that punitive damages should be awarded, it then sets the amount. If the defendant believes the damages are too high, it may object and present arguments in a motion for new trial. If the motion is overruled, further procedural protections are provided, including, one appeal of right, one discretionary appeal to the Supreme Court of Texas, and a further discretionary appeal may be tak-

en to the Supreme Court of the United States.

In the instant case, the jury was properly instructed that punitive damages could be awarded as a penalty or punishment, and an example to others, if GM's conduct was the result of "conscious indifference" to the plaintiffs' rights. The instruction and question confined the jury's award to circumstances involving conscious indifference. The jury is also limited in the amount it may properly award to that which will deter future abuses, the primary Texas policy justifying punitive damages. We hold these limitations on the jury's discretion to award punitive damages comply with federal Due Process standards. *See Haslip*, —— U.S. at ——, 111 S.Ct. at 1042. After considering the evidence, the jury returned a verdict finding that GM was consciously indifferent and assessing $2.5 million in exemplary damages.

A post trial hearing in the form of a motion for new trial was held regarding the sufficiency of the evidence supporting the award, and whether the appropriate legal standards were applied. At this hearing, the trial court had the power to order a new trial or a remittitur. After hearing the arguments, the trial court overruled the motion.

In the instant appeal, this Court has considered and reviewed the legal and factual sufficiency of the evidence supporting punitive damages and found it sufficient under the legal standards applying to an award of punitive damages. *See Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981) (Exemplary damages must be reasonably proportioned to actual damages. Factors considered are (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety.) Future appeals may be taken to review our actions today.

■ We hold that Texas procedures for awarding and reviewing punitive damages comport with the standards required by the Due Process clause of the Fourteenth

Amendment to the United States Constitution. *Haslip*, —— U.S. at ——, 111 S.Ct. at 1046; *Eichenseer*, 934 F.2d at 1385. To the extent appellant's point of error challenges the constitutionality of Texas procedure for assessing punitive damages under the Due Process Clause of the United States Constitution, it is overruled.

Appellant's sixth point of error also raises the issue whether the procedure applied in the instant case comports with the Texas Constitution; however, this point is not separately briefed and no authority is cited in support. This does not comply with TEX.R.APP.P. 74. We are unwilling to hold this issue waived for failure to follow the briefing rules. *Inpetco, Inc. v. Texas American Bank/Houston*, 729 S.W.2d 300 (Tex.1987). Thus, if appellant rebriefs this issue before we rule on its motion for rehearing, it will be considered. TEX.R.APP.P. 83. Otherwise, having complied with *Inpetco*, we will hold this issue waived.

■ GM's seventh point of error complains that the trial court erred in excluding impeaching evidence establishing that Gloria Ramirez, the wife of the deceased Josue Ramirez, was involved in a relationship after his death. In the twenty-seven months from the death of her husband to the date of her trial testimony, Gloria Ramirez dated a man for two months and then lived with him for two months. The evidence was offered to impeach her statement that after the accident she had no one to talk to and was lonely.

> In an action under this subchapter, evidence of the actual ceremonial remarriage of the surviving spouse is admissible, if it is true, but the defense is prohibited from directly or indirectly mentioning or alluding to a common-law marriage, an extramarital relationship, or the marital prospects of the surviving spouse.

TEX.CIV.PRAC. & REM.CODE ANN. § 71.005 (Vernon 1990).

This statute clearly bars admission of evidence relating to the surviving spouse's subsequent relationships, unless they result in ceremonial remarriage. It does not provide an exception allowing admission of such evidence for impeachment or otherwise. We hold the trial court did not err in excluding such evidence. *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 525 (Tex.1975). GM's seventh point of error is overruled.

■ In GM's eighth point it argues that the trial court erred in excluding evidence of Gloria Ramirez' recoveries from other defendants in rebuttal to her psychiatrist's testimony suggesting that she worried about her financial condition after her husband's death. The psychiatrist testified as follows:

Q Doctor, they made a—let me ask you this: What concerns did Mrs. Gloria Ramirez express to you about her having to cope with the loss of her husband and raising her children?

A Well, the financial situation and, of course, having to be father and mother which is the case for any woman who loses her husband and having to raise children....

GM asserts that it properly sought to rebut Suarez' testimony and its implication of financial poverty with evidence of the amount of worker's compensation and Social Security benefits and out-of-court settlements which Mrs. Ramirez had received as a result of her husband's death.

■ Generally, information concerning worker's compensation benefits is inadmissible in a suit against a third-party tortfeasor because it is not material and it could confuse the jury. *J.R. Beadel & Co. v. De La Garza*, 690 S.W.2d 71, 74 (Tex. App.—Dallas 1985, writ ref'd n.r.e.); *Pattison v. Highway Ins. Underwriters*, 278 S.W.2d 207, 210 (Tex.Civ.App.—Galveston 1955, writ ref'd n.r.e.).

■ Exceptions to this rule exist for impeachment purposes, but only when a witness gives testimony inconsistent with receipt of benefits. *De La Garza*, 690 S.W.2d at 74. In *De La Garza*, the court discussed *Barrera v. E.I. Du Pont De Nemours & Co.*, 653 F.2d 915, 920–21 (5th Cir.1981), in which the Fifth Circuit held evidence of the plaintiff's monthly benefits admissible for impeachment purposes following the plaintiff's statement that he did

not even have "a penny in [his] pocket." The *De La Garza* Court reasoned that the Fifth Circuit's ruling was based on the fact that the plaintiff's credibility was in question. The court then examined De La Garza's statement that he must still work to support himself in light of the circumstances and found that it was not inconsistent with his receipt of worker's compensation benefits because his benefits had terminated at least eighteen months before trial. Accordingly, De La Garza had not "opened the door" for impeachment purposes and the trial judge correctly excluded evidence of such benefits.

We hold that the testimony is not inconsistent with receipt of benefits and that evidence of collateral sources was properly excluded. The statement was general in nature, was in response to an open-ended question asking about Mrs. Ramirez' concerns following her husband's death. It was far from an assertion of poverty such as that in *Barrera*, or statements that she could not pay his bills. *See Exxon Corp. v. Shuttlesworth*, 800 S.W.2d 902, 908 (Tex. App.—Houston [14th Dist.] 1990, no writ); *Mundy v. Shippers, Inc.*, 783 S.W.2d 743, 744–45 (Tex.App.—Houston [14th Dist.] 1990, no writ). Point eight is overruled.

GM's ninth point of error challenges the trial court's refusal to admit evidence of Sascon's settlement with the appellees. GM sought to admit evidence of the settlement to cast doubt on the crucial testimony by Herman Skloss that he would not have placed the water tank on the truck had he received an adequate warning.

Settlement agreements between the plaintiff and a co-defendant are generally excluded. *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857 (Tex.1977); *McGuire v. Commercial Union Ins. Co.*, 431 S.W.2d 347, 352 (Tex. 1968); *Henry v. Felici*, 758 S.W.2d 836, 842 (Tex.App.—Corpus Christi 1988, writ denied); Tex.R.Civ.Evid. 408. Rule 408 does not require exclusion of such evidence where it is admitted to establish bias, prejudice, or the interest of a witness.

In the instant case, GM sought to admit evidence of the settlement agreement to show that Skloss's testimony was not an admission against interest as it appeared. This offer falls outside the scope of the Rule 408 prohibition against admission of evidence of settlements because it was probative of Skloss' bias. We hold the trial court erred in failing to admit this testimony.

The next inquiry is whether the error is reversible. This court may only reverse a trial court's judgment if the error amounts to such a denial of appellant's rights that it was reasonably calculated to, and probably did cause the rendition of an improper judgment, or probably prevented appellant from making a proper presentation of the case to this Court. Tex.R.App.P. 81(b)(1). The scope of review in this inquiry is the entire record. *Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex.1990); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 689 (Tex.1990).

After reviewing the entire record, we conclude that the error is not reversible. Skloss's testimony was significant in regard to the causation issue; however, there was other evidence, including expert testimony, establishing causation. Thus, the evidence GM sought to bring into question was cumulative. Even if GM's efforts to discredit Skloss would have been totally effective, other significant evidence existed indicating that GM's failure to adequately warn was a cause of the accident. Moreover, causation was established as matter of law by the *Technical Chemical* presumption. Under these circumstances, the judgment was not controlled by Skloss's testimony. *See Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). The error was not harmful. Tex.R.App.P. 81(b)(1). GM's ninth point of error is overruled.

In GM's tenth point of error, it attacks the legal and factual sufficiency of the evidence supporting the damage award for the conscious physical pain and mental suffering of Richardo Saenz. GM argues that there is no evidence that Saenz was alive after the accident.

The evidence showed that the truck experienced a severe blowout and became unstable. Saenz, who was not wearing a seat belt, attempted to keep the vehicle on the road. In fact, he oversteered and lost control. The truck began spinning and rolling. Saenz was thrown from the truck, and received a severe head injury. He never regained consciousness after receiving the head injury.

Although there was no evidence that he was conscious after the injury, the evidence indicated that Saenz was conscious while the truck was careening out of control. Several witnesses testified that the sound of the tire exploding was so loud they thought the blowout was on their vehicle. The evidence also showed that the truck became extremely unstable before it crashed. The truck's instability induced panic steering and certainly extreme fear and shock as Saenz became aware of his impending severe injury or death. Mental suffering is compensable if there is evidence that the victim was conscious after an accident, but before death. *See e.g., Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630, 634 (Tex.1986). We find that this is sufficient evidence that Saenz experienced mental suffering before his death, thus this damage award was supported by sufficient evidence.

GM's eleventh point of error complains that the trial court erred in allowing appellees to present expert testimony concerning exemplary damages. GM premises its argument on assertions that the expert, economist Dr. Everett Dillman, was not properly designated as an expert witness for that subject matter, and that his report was not timely delivered in compliance with a discovery deadline for expert's reports.

The record indicates that both Dillman and the fact that he would testify regarding punitive damages was designated before the deadline. Moreover, GM's net worth and much of the other evidence relating to the proper amount of exemplary damages adduced through Dillman was cumulative. Thus, admission of this evidence was not reversible error. *Gee,* 765 S.W.2d at 396. We hold that the error, if any, in the admission of this evidence was harmless. GM's eleventh point of error is overruled.

The trial court's judgment is affirmed.

NYE, C.J., dissents.

NYE, Chief Justice, dissenting.

I respectfully dissent. The majority would hold General Motors liable for failing to warn of overloading and failing to give instructions for the safe modification of a vehicle which it sold nearly twenty years ago and which had undergone serious subsequent modifications and ownerships. I would hold that the warnings that GM provided the subsequent owner satisfied any duty it had to warn purchasers of unmodified vehicles of the load characteristics and weight requirements. In any event, the adequacy of the warnings given were neither a proximate nor producing cause of the accident. This case should be reversed.

In 1972, GM manufactured and sold the Chevrolet C–50 truck cab with a bare chassis which became the subject of this suit. The purchaser converted it into a wrecker by installing winch equipment and used it as a wrecker for 15 years. Later the truck was stripped down to the bare chassis and resold. Sascon, a subsequent owner, installed a 2,000 gallon water tank on the truck, attached splash guards to it, and sold the Chevrolet C–50 truck as a tank truck to Cantu Lease, Inc.

The night before the accident in question, Cantu welded "spacers" to the truck's frame believing that this modification would "make the overload springs kick in faster." He noted that the splash guards rubbed the rear tires when the tank was full. After the spacers were installed, Cantu filled the tank with water to test how they worked. Gary Hollowell, Cantu's co-owner, testified that he was satisfied that the spacers would perform as intended and then allegedly ordered the tank to be drained to a point that it was only half-full. The evidence at trial also showed that air was added to one of the outside rear tires because it had a slow leak. After filling

the tire with air, the pressure was not checked with a gauge.

The next day, while hauling water to a job site, the tank truck's inside right rear tire blew out due to overdeflection. The truck continued to travel in a straight line to the right, but the unlicensed, untrained driver of the owners steered sharply to the left to keep the truck on the road. This steering input caused the truck to yaw, eventually causing it to flip over one and three-quarters times killing the driver.

Appellees filed suit against several defendants. By the time the case got to trial, only Sascon and GM remained in the case. Sascon settled during the course of the trial, leaving GM as the sole defendant. Judgment was entered against GM for $4,784,497.06.

The undisputed facts showed that GM manufactured only the bare chassis and marketed it as such. The variety of bodies and equipment that might have been installed on the chassis to make it a complete vehicle was limitless. GM had no way of knowing how its vehicle would be converted. The GM chassis contained a metal plate bolted to the door jamb at eye level. The location of the warning plate conformed with federal regulations. The plate showed gross vehicle weight for this vehicle as manufactured to be 16,000 pounds and maximum capability with any subsequent modifications as 24,000 pounds. The gross vehicle weight included the weight of the base truck, all added equipment, driver, and passengers, all properly located in the truck. The plate further stated in capital letters to refer to the owner's manual for intermediate or maximum gross vehicle weight ratings and for other loading information including tire inflation. The plate satisfied federal standards at the time it was manufactured. The owner's manual, which was undisputedly in the glove compartment of the modified vehicle at the time of the accident, indicated in bold, black type "Important Information On Vehicle Loading", with the subheading, "Overloading Safety Caution". It then stated:

The weight of the payload must be properly distributed over both the front and rear axles, although not necessarily evenly. The plate shows the maximum weight that the rear axles can carry. Note that the sum of these may be greater than the GVW, so that it is not necessarily proper to load both axles at the same time to the maximum capacity shown for each.

The GVW rating represents the weight that the complete vehicle is designed to carry taking into consideration the engine, transmission, frame, spring and tire capabilities. Actual front and rear end weights at the ground can only be determined by weighing the vehicle. This can be accomplished through highway weight stations or other such commercial facilities. For assistance in this regard, consult your local Chevrolet dealer. *Care should also be exercised to see that the payload is distributed on both sides of the center line of the truck as equally as possible.*

The components of your truck are designed to provide satisfactory service if the vehicle is not loaded in excess of either the gross vehicle weight, or the maximum front and rear end weights, specified on a permanent plate which is attached to the cab left door pillar. *Overloading can create serious potential safety hazards* and can also shorten the service life of your vehicle. *Your local Chevrolet Dealer can advise you concerning proper loading conditions of your vehicle.* The use of selected heavier suspension components for added durability purposes does not increase the weight rating stamped on GVW plate.

The evidence at trial showed that no Sascon employee had ever read the door plate or manual. Herman Skloss of Sascon testified that he never looked at the door plate showing the gross vehicle weight rating or read the owner's manual before installing the tank. Alvaro Alvarez, the Sascon foreman in charge of mounting the tank in the GM chassis also never looked at either the plate showing the weight ratings or the owner's manual. The employees of Cantu Leasing neither looked at the door plate nor the owner's manual.

The duty to warn is determined at the time the product is marketed. *See Petree v. Victor Fluid Power, Inc.,* 831 F.2d 1191 (3d Cir.1987). A warning must adequately and effectively communicate the risk or danger associated with the use of the product. *Ford Motor Co. v. Nowak,* 638 S.W.2d 582, 592 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

Here, the warnings and load information provided were adequate. The plate location on the door met the federal standards which were in place at the time the vehicle was manufactured. The vehicle in question was manufactured with the obvious purpose of being subsequently modified. The warnings which GM provided had to be general because the potential modifications were, according to the undisputed evidence, limitless. The warnings specified that specific loading requirements could be discussed with the local Chevrolet dealer. They provided the gross vehicle weight. They warned of the potential safety hazards if overloaded. It is important to note that the purchasers of the product in question were not uninformed consumers of goods, but parties whose business it was to modify these vehicles for their own specific purposes.

Even if the warnings could be held to be inadequate in this case, there is no evidence that the adequacy of the warning was either a proximate or producing cause of the accident. Under both negligence and strict liability theories, the inadequacy must be established to be the cause in fact in order to give rise to liability. *Technical Chemical Co. v. Jacobs,* 480 S.W.2d 602 (Tex. 1972); *Stewart v. Janssen Pharmaceutica, Inc.* 780 S.W.2d 910 (Tex.App.—El Paso 1989, writ denied). The undisputed evidence here was that no one from Sascon or Cantu had even read the owner's manual or looked at the door plate, so that any change in wording would not have avoided the accident in this case. It is inconceivable that Sascon would not have checked the weight requirements before modifying the vehicle and give appropriate warnings to affected users. Sascon, as the modifier, was in a better position to know the weight requirements and understood better the

use to which the vehicle would be put than did GM.

Cab and bare chassis trucks, like the C–50, are not purchased for general consumption; they are purchased for commercial use with the understanding that some type of modification is required to make it suitable for their intended use.

The evidence showed that in the creation of the water tank truck, Sascon did not seek out the warnings GM provided regarding overloading. Further, there was evidence that Cantu was aware of the danger associated with driving the tank truck on the highway at highway speeds with a tank of water. To avoid injury, Cantu drained the tank to a certain level, added the spacers, and added air to a leaky tire, but *never* consulted the owner's manual or door plate to determine if he was overloading the truck.

I would hold that in a case like this, the law requires and should require only the second-stage manufacturer to warn of hazards arising from the additions which the second-stage manufacturer has made to the truck. *Verge v. Ford Motor Co.,* 581 F.2d 384 (3rd Cir.1978). In *Verge,* a second-stage manufacturer installed a garbage compacting unit to a Ford truck chassis. The plaintiff was injured when the modified vehicle backed up, crushing him. The plaintiff alleged that the truck was unreasonably dangerous because Ford failed to install a backup warning device.

The court concluded that when a finished product is the result of substantial work by more than one party, it would look to trade custom, relative expertise and practicality in determining responsibility. Utilizing these factors, the court held plaintiff had failed to present proof sufficient to impose liability upon Ford.

Likewise, in *Elliott v. Century Chevrolet Co.,* 597 S.W.2d 563, 564–65 (Tex.Civ. App.—Fort Worth 1980, writ ref'd n.r.e.), a GM manufactured truck chassis was modified for beer storage by a third party. This modification obscured the rear view from the cab. The plaintiff was crushed between the beer truck and a loading dock

because the truck's driver could not see him. The plaintiff alleged that GM should have installed a warning buzzer on the truck chassis to prevent such accidents because GM should have foreseen that a beer storage unit would be added which would block the driver's view to the rear of that modified truck.

The court disagreed, primarily because like the case at bar, the chassis had been substantially modified following its original sale. The court, following the *Verge* factors, found that GM did not have the expertise of the secondary manufacturer to assess design implications on safety which any design changes might require. It also found that it would be more practical for the party adding the beer storage unit to also install the buzzer because there were so many possible uses of a GM chassis for which a buzzer would be unnecessary.

Recently, the Fifth Circuit followed the *Verge* and *Elliott* rationales in *Trevino v. Yamaha Motor Corp.*, 882 F.2d 182, 185–87 (5th Cir.1989). The court held that the second-stage manufacturer, who modified the vehicle and sold it as modified, clearly was in a better position than the first-stage manufacturer to warn of defects in the modified vehicle.

Applying the *Verge* factors to this case, it is clear that GM met all required burdens and duties. Second, Sascon was in a much better position than GM to warn of the dangers of its manner of modification. The evidence at trial was that the tank truck was more than half-full and may have been full at the time of the accident. Sascon's president said that it was standard in the industry to drive an *empty* truck to a job site, fill the tank at the site, and drive slowly while dispersing water as needed. Jerry Wallingford, a forensic engineer, stated that in the business Cantu was in, a water tank truck customarily would be filled at the job site and when loaded, driven off-road at extremely slow speeds. On the facts of this case, Sascon was in a much better position than GM to warn of any defect in the tank truck and splash guards to the bare chassis-cab unit.

Third, the evidence showed that Sascon is more expert in water-tank truck design than GM and it would certainly be more practical for Sascon to warn of the safe use and loading of a water tank truck. Certainly, it is not the duty of GM to install a special plate to warn of water tank loading when such a warning would be impractical or ill advised should the truck be modified into countless other possible configurations.

I would hold that GM's duty stops far short of that advocated by the majority here. It is clear to me that the cause of this accident was not the failure of GM to provide additional or specialized warning in the truck. The loaded water tank truck was being driven by an untrained, unlicensed driver at speeds which were far too high. There was evidence that the driver was not instructed on correct speed to drive the truck which was standard in the industry. The company (Sascon) that modified the truck never checked the weight requirements and limitations of the vehicle as specified by the warning on the door jamb and service manual. The owners never checked the weight requirements and limitations that were on and in the truck. The leaky tire was never checked for correct pressure. The splash guards rubbed the rear tires when the truck was full and there was evidence that the truck was full of water. Nobody ever checked the weight requirements and limitations of the vehicle that GM provided to Sascon.

GM is being held liable for failing to warn of the danger of something that it could not possibly have anticipated at the time of manufacture. The concept of duty simply cannot be thinned to cover the facts of this case.

The burden of any additional warnings, which would be necessary because of some unique characteristic resulting from subsequent modifications, would be solely Sascon's responsibility. Any warning inadequacy was as a matter of law neither a proximate nor producing cause of the accident. I would reverse and render the judgment of the trial court.

## OPINION ON MOTION FOR REHEARING

HINOJOSA, Justice.

In our opinion we refused to completely overrule appellant's sixth point of error because the point of error was not properly briefed. *Inpetco, Inc. v. Texas American Bank/Houston,* 729 S.W.2d 300 (Tex.1987) (per curiam denial of writ of error). In this point appellant argued that the punitive damage award in this case violated our state constitution. We provided appellant an opportunity to rebrief this issue with its motion for rehearing. It has. We now address the second half of appellant's sixth point of error regarding whether the punitive damages awarded in the instant case violate appellant's rights under the Texas Constitution.

Appellant argues that Texas procedure for assessing punitive damages applied in the instant case is unconstitutional under the Texas Constitution, Article I, § 19 because: 1) a higher standard of proof than a preponderance of the evidence should be required; 2) admission of evidence of defendant's wealth should not be permitted; and 3) the gross negligence standard is impermissibly vague and does not provide a meaningful standard of review.

 Texas law permits assessment of punitive damages to deter future misconduct, punish wrongdoers, and to reimburse the plaintiff for remote losses. *Lunsford v. Morris,* 746 S.W.2d 471, 471–72 (Tex.1988); *Cavnar v. Quality Control,* 696 S.W.2d 549, 555–56 (Tex.1985); *Borden, Inc. v. De la Rosa,* 825 S.W.2d 710, 720, (Tex.App.—Corpus Christi 1991, no writ hist.); *Celotex Corp. v. Tate,* 797 S.W.2d 197, 209 (Tex.App.—Corpus Christi 1990, no writ). Such damages may only be awarded if the evidence establishes an entire want of care which would raise the belief that the act or omission complained of was the result of conscious indifference to the right or welfare of the plaintiff. *Burk Royalty v. Walls,* 616 S.W.2d 911, 920 (Tex.1981).

Whether an entire want of care exists in a particular case is not a fact so unique, specialized, or difficult to determine that a higher standard of proof is required. Moreover, unlike criminal cases or family law cases, the effects of most punitive damage awards are not different from ordinary damage awards. Cherished constitutional freedoms are not at issue in such cases, merely money. Like other damages, whether punitive damages are appropriate and the correct amount can readily be determined by a properly instructed jury. Prior decisions unanimously conclude that a higher standard is not required by the Texas Constitution. *See e.g. Lawson–Avila Const. Inc. v. Stoutamire,* 791 S.W.2d 584, 593 (Tex.App.—San Antonio 1990, writ denied) (citing *Ford Motor Co. v. Durrill,* 714 S.W.2d 329 (Tex.App.—Corpus Christi 1986)), *writ granted on other grounds and vacated,* 754 S.W.2d 646 (Tex.1988). The legislature has also concluded that punitive damages may be awarded if a preponderance of the evidence shows fraud, malice, or gross negligence. TEX.CIV.PRAC. & REM. CODE ANN. § 41.003 (Vernon 1990).

 The interests at stake when punitive damages are at issue are not significantly different than liability questions or other issues in civil cases. The preponderance of the evidence standard generally applies in civil cases, and we believe it should continue to apply to punitive damage awards. *See International Armament Corp. v. King,* 686 S.W.2d 595, 597 (Tex.1985). We therefore hold that the Texas Constitution does not require a clear and convincing standard of proof for assessment of punitive damages.

 The next issue is whether admission of evidence regarding a defendant's net worth violates appellant's rights under the Texas Constitution. One of the purposes of punitive damage awards is to deter future misconduct; thus evidence of net worth is relevant to determine the amount of such an award. *Lunsford,* 746 S.W.2d at 471–73. Appellant has advanced no reason why admission of such evidence violates its rights under the Texas Constitution, and we find none. We hold that admission of relevant evidence of appellant's net worth to prove the appropriate

amount of punitive damages does not violate the Texas Constitution.

██ The final issue we address is whether the gross negligence standard is impermissibly vague. Gross negligence is a concept that has been clearly defined by the Supreme Court of Texas. *Burk Royalty*, 616 S.W.2d at 920. This standard is not intrinsically different or more difficult to understand than the concept of negligence or many other commonly accepted legal concepts. Review of punitive damage awards is guided by particularly detailed and specific guidelines. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981); *Borden*, at 720. We hold that this standard is not so vague that it violates the Texas Constitution.[1] *K–Mart Corp. v. Pearson*, 818 S.W.2d 410, 417 (Tex.App.— Texarkana 1991, no writ hist.); *State Farm Mut. Auto Ins. v. Zubiate*, 808 S.W.2d 590, 603 (Tex.App.—El Paso 1991, writ denied).

Appellant's arguments that Texas procedure for assessing punitive damages violates the Texas Constitution have no merit. We overrule point of error six.

We overrule appellant's motion for rehearing. The trial court's judgment remains AFFIRMED.

### OPINION ON MOTION FOR REHEARING

NYE, Chief Justice.

I would not reach the issues addressed in the Court's Opinion On Motion for Rehearing for the reasons stated in my dissent to the opinion of this Court handed down on November 27, 1991. I am still of the opinion that the judgment of the trial court should be reversed and rendered.

---

1. Writ has been granted on this issue in *Transportation Ins. Co. v. Moriel*, 814 S.W.2d 144 (Tex.App.—El Paso 1991, writ granted). *Moriel* held this issue waived without ordering it rebriefed as we did. *See Inpetco*, 729 S.W.2d at

300. Other significant distinctions exist between this case and *Moriel*. We do not have the benefit of the *Moriel* court's reasoning on this issue and we do not rely upon this decision.