SAM MONTGOMERY OLDSMOBILE COMPANY, Appellant,

v.

R. L. JOHNSON et al. and Champion Home Builders Company, Appellees.

No. 17747.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Aug. 13, 1981.

Rehearing Denied Sept. 24, 1981.

Hester, Stevenson, Aman, Shipp & Jonte, S. Lee Stevenson, Houston, for appellant.

Archer & Peterson, Paul F. Waldner, Barrow, Bland & Rehmet, James I. Smith, Jr., Houston, for appellees.

Before DOYLE, EVANS and WARREN, JJ.

DOYLE, Justice.

This is an appeal from a judgment awarding appellees, R. L. Johnson, N. F. Renaud and Jay A. McMahon, treble damages and attorney's fees under the Texas Deceptive Trade Practices Act (DTPA or Act) against appellant Sam Montgomery Oldsmobile Company (Montgomery) and granting appellee Champion Home Builders Co., (Champion) indemnity and attorney's fees against Montgomery.

Trial was to the court. Findings of fact and conclusions of law were filed and signed by the trial judge on May 6, 1980, and are a part of the record before us, contrary to the allegations of appellees and Champion in their briefs. Montgomery filed motions for summary judgment, indemnity against Champion and a new trial, all of which were denied. Nine points of error are presented on appeal.

Several volumes of testimony were adduced at the trial, which we shall summarize. In the spring of 1977, appellees, who were close personal friends and officials of the Operating Engineers Union in Houston, Texas, decided to jointly purchase a motor home for their personal use and to lease for profit. After visiting several dealers, they went to Montgomery and consulted with that company's salesperson, Peggy Bates. They informed her why they wanted a motor home and were shown a 1976 Champion motor home by Ms. Bates. Appellees purchased the motor home from Montgomery in June of 1977. Immediately they began experiencing problems with it. Appellee Renaud went to Montgomery to pick up the vehicle but was told it would not run because the battery was dead and the fuel pump was broken. Several days later it was brought back for servicing and a written list of complaints was given to the service manager. During the next six-week period the motor home was brought in on six more occasions with numerous mechanical and equipment problems. The most prevalent problem was that there was some sort of malfunctioning in the fuel line and the vehicle would not run. During the time the motor home was in Sam Montgomery's service department, appellee Johnson witnessed its being damaged by Montgomery personnel when a porter backed it into another coach and also witnessed evidence of poor workmanship. Appellees had entered into a leasing agreement with a local company to lease the motor home in June of 1977 but were never able to lease it because of the recurrent mechanical problems. The equipment and mechanical problems with the motor home were so severe that the actual market value of the home was reduced by approximately 30%.

The motor home was a 1976 Champion model which had been manufactured by appellee Champion, a builder of a line of recreational vehicles. Champion sold the motor home to Montgomery in May or June of 1976. It is to be noted that Champion drove the vehicle 800 miles from Thomasville, Georgia, to Houston for delivery to Montgomery. When Montgomery accepted delivery of the vehicle from Champion, it was inspected and signed for as being free from substantial defects in materials and workmanship and free from shortage or damages. The vehicle remained on Montgomery's sales lot for eleven months prior to its sale to appellees, during which time

no regular maintenance was performed to keep it in its original good condition. During this eleven-month period various parts and fixtures were taken from the motor home and used on other vehicles. By the time the vehicle was sold to appellees, many of these parts had been replaced by other than new factory parts and some items, such as doors, had been fabricated by Montgomery in its shop. There is testimony that appellees concluded that Montgomery was either incapable of or had no intention of making the necessary repairs and appellees resorted to other companies to perform the corrective work.

Against this background of facts, Montgomery contends that everything that happened to the motor home was the fault of Champion and that any problems that resulted from its eleven-month period on the company's sales lot was corrected by Montgomery's make-ready procedure. Champion denies all liability for any damages suffered by appellees and argues that after the 800 mile trip from Thomasville to Houston, any defects in material and workmanship, as well as any mechanical malfunctions, would have likely been revealed. To the contrary, Champion points out, Montgomery's sales manager, Mr. Thomas, testified that when the vehicle was delivered to Montgomery in Houston, he inspected it and found it free from shortage, damage and substantial defects in material and workmanship and that he signed the check-out sheet attesting to these facts.

■ Montgomery's first seven points of error are directed at the trial court's findings that the evidence was sufficient to support its conclusions that deceptive trade practices had occurred and were a producing cause of appellee's damages. Initially, Montgomery complains that the court erred in finding that the misdescription of the vehicle was a violation of the DTPA and constituted a breach of implied warranty causing a part of appellees' damages. This claim has no foundation in the court's findings or conclusion. The court's specific findings on this point were to the effect that Champion was the party who made the clerical error in wrongly identifying the vehicle as a Concord model when, in fact, it was a Champion model but that such "mistake in title was not a producing cause of the damage sustained by Plaintiffs." Point of error number one is overruled.

■ Montgomery next insists that the practice of cannibalization i. e., the practice of taking parts off one vehicle and using such parts to make another vehicle ready for sale, was not a deceptive trade practice. Conceivably, such a practice may be conducted in such a manner that no problem would be encountered. To temporarily "borrow" parts from one vehicle and later replace such parts with identical factory duplicates would pose few, if any, complaints. However, the testimony before us shows not only that cannibalization took place with parts from appellees' motor home but that such parts were not replaced with factory replacement items matching the original specifications. Some replacements were fabricated by Montgomery's workmen resulting in a host of mismatching and misfitting problems with doors, trim, paint and varnish. Many of the defects in material and workmanship appeared after delivery and usage. The motor home was sold to appellees as a new vehicle with no disclosure to appellees that replaced parts on their vehicle were not factory but had in fact been fabricated by Montgomery. This constitutes a deceptive trade practice as defined by § 17.46(a) of the Act.

■ We can not agree with Montgomery's position that the court erred in holding that it committed a deceptive trade practice by failing to voluntarily tell the appellees that the motor home had been located on its sales lot for eleven months without any regular maintenance. Montgomery's argument is that such a disclosure was not mandated until the 1979 amendment to the Act became effective, which was after appellees' cause of action arose. The non-disclosure occurrence here involved falls within the general ambit of the Act as set forth in § 17.46(a). The basic purpose of this Act, as shown by the legislative intent,

was to guarantee to the consumer the greatest possible knowledge about any potential undesirable features of a product. Texas courts have followed the Federal Trade Commission and federal courts in applying the Act. Our Supreme Court in *Spradling v. Williams*, 566 S.W.2d 561, 563 (Tex.1978) had the occasion to hold that the representation of the model of a boat to be for the year 1973 instead of 1972, was a deceptive trade practice. There was evidence that the defendant Williams had relied on the representations as to model and price. The Court cited *Florence Mfg. Co. v. J. C. Dowd and Co.*, 178 F. 73, 75 (2nd Cir. 1910);

> The law was not made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions.

This same rationale underlay the holding of our Supreme Court in *Jerry D. Cameron, et ux v. Terrell and Garrett, Inc.*, Tex., 618 S.W.2d 535 (1981). There the plaintiffs had been told a house contained 2400 square feet of space when in fact it contained only 2245 square feet. The testimony showed that the plaintiffs relied on the representation, based the purchase on such footage and would not have purchased the house had they known otherwise. The Court held that this was a deceptive trade practice and that the plaintiffs were entitled to their damages.

In the case before us, the evidence is abundant that Montgomery knew that many maintenance problems had arisen since the motor home's eleven month stay on its sales lot. Montgomery knew that some cannibalization had taken place, that replacements used were not factory originals and that the workmanship was not first class in many instances. Appellees testified that if the facts had been known to them prior to their purchase of the motor home, such revelation would have definitely affected their decision to purchase. Montgomery's sales person, Ms. Bates testified that she did not know that the vehicle had

been on the lot for eleven months and that major mechanical work had been performed on it. She indicated that had she known of these problems she would have advised appellees, "Don't buy this one..." "...I would have been honest with them."

Failure to disclose to appellees that the motor home had remained on its lot for eleven months without any regular maintenance was a deceptive trade practice. In a case such as this "Silence is not golden...", and Montgomery's failure to tell the whole truth constituted a method of deception which resulted in damages to appellees. Texas Consumer Litigation, Bragg, Maxwell and Longley (1978); *P. Lorillard Co. v. FTC*, 186 F.2d 52, 58 (4th Cir. 1950).

Montgomery next argues that Section 17.46(b)(5) and (7) of the DTPA does not apply to the facts of this case since said sections do not apply to vehicles which are allegedly in need of repair. Montgomery cites the holding of a court of civil appeals case as its authority. The identical case cited was reversed by our Supreme Court in *Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex.1980), with this comment: "Regardless of the reason, when a good does not have the characteristics it is represented to have, or perform as represented, the injury to the consumer is the same. There is no justification for excluding some misrepresentations and including others on the basis of the reason for their falsity." The Court found that the boat involved in *Pennington* was a used one in need of repairs although represented as being "just like new." The consumer testified he would not have purchased the boat had the seller not represented its condition as excellent. The Court held that Section 17.46(b)(5) and (7) did apply.

■ The motor home was sold to appellees as a new 1976 vehicle. Appellee Johnson testified as follows:

(Questions by Mr. Waldner)

A. It's a very good looking motorhome. It has Champion wrote on the front and back. We were told it was a new 1976 model. She said she could make us a

good deal on it due to the fact it was a '76 model. . . .

Q. Was it represented to you by Sam Montgomery personnel that this was a new coach?

A. Yes, sir, it was.

Q. Were you informed this coach had been reconditioned?

A. No.

Q. Were you ever informed that this coach had been on the lot for in excess of 11 months?

A. No, sir.

Q. Did anyone disclose this coach had been cannibalized and that the replacement parts had been fabricated by Sam Montgomery?

A. Not prior to the sale.

Q. Was it ever disclosed that this motorhome had been broken into, vandalized, and equipment stolen out of it?

A. No.

Q. If you had known all of these things that we have talked about prior to the sale, would it have affected your decision to purchase the motorhome?

A. Definitely.

During the course of the trial the undisputed testimony showed that some 32 defects surfaced in connection with the motorhome, ranging from some caused by "lot rot" to others attributed to sloppy workmanship in repair and replacements attempts. Sufficient evidence was adduced to show that Montgomery violated subsections (5) and (7) of 17.46(b) of the Act and that such violations were a producing cause of appellees' damages.

We have examined the facts and circumstances offered by Montgomery to support its contention that the motorhome defects complained of by appellees were not caused by its having rendered sloppy or unworkmanlike service, but rather were due to Champion's poor manufacture, assemblage and use of defective component parts. The trial court found some 67 facts, among which were that Champion delivered the motorhome to Montgomery free from substantial defects in material and workmanship; that Champion manufactured the mo-

tor home free from substantial defects in materials and workmanship and that Champion's warranties did not apply to or include coverage for the substantial defects in material and workmanship caused by Montgomery. Suffice it to say, the trial court had before it ample evidence upon which to base its findings.

We do not agree that appellees failed to give Montgomery written notice of the defects with the motorhome and a reasonable opportunity to cure them. In *Melody Home Mfg. Co. v. Morrison*, 502 S.W.2d 196, 203 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n. r. e.), this court had the occasion to discuss the question of notice in a case involving the purchase of a defective mobile home. There this court stated that Section 2.607 of the Tex.Bus. and Comm. Code only required that the seller be informed that the purchaser is claiming that a breach of warranty of fitness has occurred. In the case before us, there was testimony that from May of 1977 to the middle of July, the motorhome virtually stayed in the service department of Montgomery. Ms. Bates and Mr. Wallace, both witnesses for Montgomery, testified concerning notice of the defects. Ms. Bates stated that whenever appellees gave her written lists of complaints, they were in specific details and she would make photocopies for herself and the service department. Mr. Wallace testified if a vehicle is returned to the service department several times over a six or seven week period, ample time is afforded to remedy a defect such as the fuel line on the motorhome. This testimony together with that of appellees shows that Montgomery had the notice and a reasonable opportunity to cure the motorhome defects. Appellees' refusal to return the vehicle for further servicing was justified, based on Montgomery's past performance, and did not in any way prejudice their right to sue for breach of warranty or treble damages under the DTPA. *Jim Walter Homes, Inc. v. Foster*, 593 S.W.2d 749, 752–753 (Tex.Civ.App.—Eastland 1979, no writ).

Montgomery's remaining points of error are considered and overruled. The trial court carefully analyzed and computed the appellees' actual damages based on the evidence which showed the net loss based upon the reduction of market value of the motorhome to be $3,500.00, plus the loss in rentals which was $11,542.50. This total of $15,042.50 was then trebled as provided for by the Act. Attorneys' fees were proven to be $7,410.00. Such method of computing damages under DTPA finds sanction in *Nobilty Homes of Texas v. Shivers*, 557 S.W.2d 77 (Tex.1977); *Woods v. Littleton*, 554 S.W.2d 662, 670–671 (Tex.1977) and *Woo v. Great Southwestern Acceptance Corp.*, 565 S.W.2d 290 (Tex.Civ.App.—Waco 1978, writ ref'd n. r. e.). In *Nobilty Homes* the Court said: ". . . Direct economic loss may also be measured by costs of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product." In *Woo*, the court stated that the Act was intended to allow a litigant who has been adversely affected the greatest amount of actual damages which he can prove was caused by the defendant's conduct, thus accomplishing the dual purpose of encouraging consumers to litigate the complaints and discouraging unlawful conduct.

The question of the constitutionality of the DTPA was answered in *Pennington v. Singleton*, supra. Montgomery argues that the Act is unconstitutional for three reasons. It states that (1) the treble damages portion is a criminal penalty without due process protections; (2) the Act is vague in defining false, misleading and deceptive trade practices; and (3) the Act does not require intent as an essential element of an actionable deceptive trade practice. *Pennington v. Singleton* gives an exhaustive discussion of each of the issues raised by Montgomery challenging the constitutionality of the Act. The Court then held the Act to be constitutional.

The judgment of the trial court is affirmed and all costs are assessed against Montgomery.