**HAYNES & BOONE, Appellant,**

v.

**BOWSER BOULDIN, LTD., a Texas Limited Partnership & Bouldin Development Company, Appellees.**

No. 04–91–00555–CV.

Court of Appeals of Texas, San Antonio.

Sept. 15, 1993.

Order of Voluntary Remittitur Sept. 17, 1993.

Rehearing Denied Nov. 2, 1993.

George H. Spencer, Clemens & Spencer, San Antonio, Mike A. Hatchell, Molly H. Anderson, Ramey, Flock, Jeffus, Crawford, Harper & Collins, Tyler, for appellant.

Bernard Wm. Fischman, Franklin D. Houser, Tinsman & Houser, Inc., San Antonio, for appellees.

Before REEVES, C.J., and CHAPA and GARCIA, JJ.

## ON APPELLANT'S AND APPELLEES' MOTIONS FOR REHEARING

REEVES, Chief Justice.

Our original opinion which was delivered and filed on July 14, 1993, is withdrawn and this opinion is substituted therefore.

This appeal questions a legal malpractice judgment. Bowser Bouldin/Bouldin Development Company (appellees) successfully sued its former law firm Haynes & Boone (appellant) under the theories of common law negligence and the DTPA. Bowser Bouldin/Bouldin Development Company (Bouldin) conditionally elected the DTPA remedy and recovered both actual and punitive damages. Bouldin won by establishing that the law firm's conduct, through one of its attorneys, caused an unfavorable settlement in a lawsuit which led to the eventual financial loss of its shopping center.

Haynes & Boone admits their breach of duty caused some injury. They assert, however, that they did not cause all the injury for which the jury found them liable; Haynes & Boone finds error with certain elements of the judgment award for actual and punitive damages.[1] In our original opinion we reversed and remanded to the trial court for a new trial. Pursuant to Tex.R.App.P. 85(e), appellees filed a voluntary remittitur to damages awarded in answer to jury question 12(4). This court denies appellees' request for voluntary remittitur. We grant appellees' and appellant's motion for rehearing. Appellees are free to file another voluntary remittitur order subsequent to the issuance of this opinion.

1. Because Bouldin conditionally elected the DTPA remedy, we consider Haynes & Boone's points of error only as they relate to the DTPA cause of action.

## FACTS

Rudy Belton is the president of Bouldin Development Company. Together with his partnership Bowser Bouldin, he developed a two-story strip center on Lemmon Avenue at Dallas in 1985–1986. Blockbuster Video (Blockbuster) pre-leased before development financing was obtained. Bouldin's expert labeled Blockbuster the "anchor tenant" because Blockbuster leased a significant amount of square footage and gave financial credibility. It was projected that Blockbuster would draw customers for all ground level tenants that depended on walk-up traffic. According to Bouldin's legal theory for recovery, without an anchor tenant, the strip center is a mere collection of stores without meaning to customers; consequently, customers do not come and the stores go out of business. There was testimony that the anchor tenant is the most important factor to a strip center's viability. The strip center was completed November 1986 and had a 95% occupancy rate.

In early 1987 two problems arose with Blockbuster concerning the second floor lessee Sparx, a punk rock dance club. First, water leaked into the Blockbuster store allegedly damaging $25,000.00 worth of rental tapes. Second, parking congestion resulted from valet parking provided by Sparx. Also, Blockbuster customers complained about intoxicated, drugged, teenagers hanging around the store. Blockbuster was not satisfied with Bouldin's attempt to cure the problems and subsequently obtained a temporary restraining order to reserve parking spaces for Blockbuster customers.[2] Once the temporary restraining order was granted, Blockbuster sued Bouldin claiming breach of lease (with a plea for rescission), breach of the covenant of quiet enjoyment, and fraudulent misrepresentations. Richard Capshaw, an associate attorney at Haynes & Boone, was retained to defend Bouldin.

The Blockbuster trial was set for December 1987. Blockbuster requested a continuance. Belton protested to Capshaw, but

2. Blockbuster lost an attempt to enjoin further water leaks.

Capshaw accepted the request since little or no discovery had been completed. The trial was reset for May 9, 1988.

In June 1987, Bouldin executed a $5.35 million earnest money contract for the purchase of the strip center. On January 27, 1988, the potential buyer refused to purchase the strip center citing the following reasons: (1) liens against the property; and (2) lease disagreements with Blockbuster.

Blockbuster delivered interrogatories to Haynes & Boone. Haynes & Boone arguably responded late with incomplete interrogatory answers. On April 18, Blockbuster filed a motion for sanctions against Bouldin for failing to timely answer interrogatories. The vacationing Capshaw missed the hearing and the trial judge ordered sanctions striking Bouldin's pleadings. A default judgment was entered against Bouldin on the issues of liability. Upon returning from vacation, Capshaw filed a motion to reconsider which was granted. A new sanctions order was signed which instructed Bouldin to complete and serve the interrogatories on Blockbuster by June 30, 1988. Additionally, by July 19, 1988, Bouldin was to pay Blockbuster $1500.00 to reimburse it for attorney fees. If Bouldin failed to satisfy these two requirements, then the pleadings would be struck automatically and a default judgment would be entered in favor of Blockbuster without a further motion or hearing. The $1500.00 was not paid by July 19, 1988. Consequently, Bouldin's pleadings were struck and a default judgment on liability issues was entered in favor of Blockbuster.

On April 14, 1988, during the sanction order problem, a $4.4 million earnest money contract was executed for the purchase of the center. This earnest money contract fell through and, according to Belton, it fell through because of the Blockbuster dispute.

According to Belton, because of the default judgment, Bouldin was forced subsequently into an unfavorable settlement with Blockbuster which allowed Blockbuster to rescind its lease with 90 days notice. Belton could neither sell the project nor obtain long-term financing. Consequently, Bouldin defaulted on his construction note. Haynes & Boone admitted ratifying Capshaw's activities.

Bouldin sued successfully the law firm Haynes & Boone for legal malpractice and conditionally elected the DTPA cause of action.

## STANDARD OF REVIEW

■ Haynes & Boone asserts factual and legal sufficiency points of error. In deciding a no evidence point, we consider only the evidence and inferences that support the jury findings and disregard all evidence and inferences to the contrary. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex.1985); *East Texas Theatres, Inc. v. Rutledge*, 453 S.W.2d 466, 467 (Tex.1970). The point must be sustained if there is a complete absence of, or no more than a scintilla of evidence which supports the verdict. *McKnight*, 689 S.W.2d at 207; *Freeman v. Texas Compensation Ins. Co.*, 603 S.W.2d 186, 191 (Tex.1980).

■ In determining the sufficiency of the evidence, the court will consider and weigh all evidence. The finding will be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

## ACTUAL DAMAGES

Haynes & Boone asserts there is no evidence or factually insufficient evidence that certain damage elements in Jury Question No. 12 are proper or resulted from the occurrence in question. Specifically, Haynes & Boone complains that the following elements of damage, which were awarded by the jury under the DTPA, are improper: (1) $1,087,-800.18 invested by or on behalf of Bouldin in the shopping center (lost because of mortgage foreclosure); (2) $284,639.00 in lost rents to Bouldin resulting from Blockbuster's rescission of lease; (3) $60,000.00 paid by or on behalf of Bouldin in settlement of liability under mortgage; and (4) $38,484.00 paid to settle Blockbuster suit.

■ Actual damages under the DTPA means those recoverable at common law.

*Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 939 (Tex.1980), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). The DTPA must be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty. TEX.BUS. & COM.CODE ANN. § 17.44 (Vernon 1987). The amount of actual damages recoverable under the DTPA is determined by the total loss sustained as a result of the deceptive trade practice. *Kish v. Van Note,* 692 S.W.2d 463, 466 (Tex.1985). Two measures of damages are recognized under the DTPA: the "out of pocket" measure and the "benefit of the bargain" measure. *W.O. Bankston Nissan, Inc. v. Walters,* 754 S.W.2d 127, 128 (Tex.1988). These measures of damages are not exclusive; other measures of damages are permitted to ensure the plaintiff is made whole. *Henry S. Miller Co. v. Bynum,* 836 S.W.2d 160, 162 (Tex.1992) (lost capital investment recovered); *see, e.g., White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260 (Tex.1983) (jury entitled to consider lost profits question). Consequently, if Haynes & Boone's wrongful acts were a producing cause of the contested damage elements, we will uphold them in order to make Bouldin whole. *See* TEX.BUS. & COM.CODE ANN. § 17.50(a) (Vernon 1987).

■■■ Haynes & Boone asserts there must be a "causal nexus" between an injury and monetary damages. Under the DTPA, Haynes & Boone is liable if its deceptive trade practice is a producing cause of actual damages. *See* TEX.BUS. & COM.CODE ANN. § 17.50(a) (Vernon 1987). Unlike proximate cause, "producing cause" under the DTPA does not encompass the element of foreseeability; a consumer only needs to prove the amount of actual damages factually caused by the deceptive trade practice. *Hycel, Inc. v. Wittstruck,* 690 S.W.2d 914, 922 (Tex. App.—Waco 1985, writ dism'd w.o.j.). "Producing cause" means efficient, exciting, or contributing cause. *Dubow v. Dragon,* 746 S.W.2d 857, 860 (Tex.App.—Dallas 1988, no writ).

We will review evidence from the record concerning whether Capshaw's actions were the producing cause of the contested damage elements.

Blockbuster brought suit against Bouldin in early 1987 in order to rescind its lease. Shortly thereafter in July 1987, Bouldin and a buyer entered into a $5.35 million earnest money contract for the purchase of the strip center. Belton instructed Capshaw in a June 23, 1987 letter:

I want to make it perfectly clear to you that I will not, under any circumstances, make a deal or settlement with Blockbusters which would be favorable to them as a result of my desire to complete this sale. I will not make a deal with a gun to my head. Therefore, you need to make certain that in your communication there can be no misinterpretation of my motivation. I see my choices, basically, as (1) getting the Blockbuster law suit and any threat of further legal action dismissed and completing the sale, and, filing the appropriate insurance claims for any damage caused Blockbuster by the water leaks; or (2) losing a sale because of the buyer's concern over the Blockbuster allegations and then pursuing Blockbuster for damages.

Bouldin's expert testified that landlord/tenant conflicts need to be resolved quickly and successfully because one cannot sell a strip center under the cloud of an anchor tenant dispute. Trial was set for December 1987 but almost no discovery had been done. Consequently, Blockbuster asked for a continuance. Belton protested but Capshaw accepted the request in order to obtain discovery. The trial was reset for May 9, 1988. The following month the potential buyer refused to purchase the strip center. The potential buyer wrote Belton:

I appreciate your efforts to satisfy our concerns in connection with the Highland View Retail Center located at 4411 Lemmon Avenue, Dallas, Texas. However, due to your disclosure about the lawsuit filed by Blockbuster Videos and the liens currently on title, including the lis [sic] pendens from SMP, Inc. in which they are suing for damages up to $500,000, I do not feel it would be prudent for us at this time to continue pursuing the acquisition of your property. Therefore, please consider

this my written notice that we are terminating the contract to purchase your property pursuant to our rights to do so contained in that contract.

The next foible surrounds the late filing of answers to interrogatories propounded by Blockbuster. A delivery service used by Blockbuster hand delivered discovery requests to the law offices of Haynes & Boone on March 11, 1988. The delivery agent swore in an affidavit that they were delivered at 5:20 P.M. during business hours. The discovery requests, however, were stamped "Received March 14, 1988" which was a Monday. In a letter to Belton, Capshaw informed him that "Responses to these discovery requests must be filed on or before April 11, 1988." Additionally, he instructed Belton to answer the interrogatories concerning Bowser Bouldin and Bouldin Development Company but did not instruct him to answer questions regarding the entity Dale Enterprises, the owner of Sparx.

Interrogatory answers were delivered to Blockbuster April 14, 1988; the answers concerning Dale Enterprises were incomplete and the answers arguably were filed late. Capshaw swore in his answers to admissions that Bouldin had no ownership interest in Dale Enterprises, the owner of Sparx. Bouldin, however, did not object to answering them. On April 18, Blockbuster filed a motion for sanctions against Bouldin for failing to timely answer interrogatories. Capshaw was on vacation when the notice of this action was sent to Haynes & Boone. When he called the office, his secretary informed him that the motion had been filed. He asked her if a hearing was set and she responded erroneously that she did not think so: She did not see the fiat which set a hearing for 11:00 A.M. on April 22, 1988. Consequently, Capshaw missed the hearing. Sanctions were imposed striking Bouldin's pleadings and a default judgment as to liability was ordered.

Capshaw was successful in getting the trial judge to reconsider the imposition of sanctions. The sanctions order and default judgment were dissolved. A new sanctions order was signed: If Bouldin did not complete and deliver the interrogatories on Blockbuster by June 30, 1988 and pay Blockbuster $1500.00 reimbursement for their attorneys' fees by July 19, 1988, their pleadings would be struck automatically and a default judgment would be entered in favor of Blockbuster without further motion or hearing. Completed interrogatories were filed on time but the $1500.00 was not paid by July 19, 1988. Consequently, a default judgment was entered on liability issues in favor of Blockbuster.

On April 14, 1988 during the sanction order problem, a $4.4 million earnest money contract for the purchase of the center was executed. The contract provided that the buyer could terminate the contract if: (1) he was not satisfied with the tenant leases and their amendments or modifications; and (2) there are existing defaults under any tenant leases that are valid and enforceable. Bouldin was required to provide estoppel certificates from tenants before closing. Under the contract, Bouldin could not alter, modify, or change any tenant leases without the prior consent of the buyer. Additionally, in order to close the transaction, Bouldin was obligated to clear title and settle any and all litigation affecting the property. This earnest money contract fell through and, according to Belton's testimony, it fell through because of the Blockbuster dispute.

Belton testified that because of the default judgment, he was forced subsequently into an unfavorable settlement with Blockbuster which allowed Blockbuster to rescind its lease with 90 days notice. Belton maintained that he could neither sell the project nor could he obtain long-term financing. Consequently, Bouldin defaulted on his construction note. Bouldin's expert testified that a developer cannot sell his strip center under the cloud of an anchor tenant dispute and cannot obtain long-term permanent financing. Lenders and prospective purchasers look to the anchor tenant as part of the financing or sales package. Once the Blockbuster suit was lost, and with it Bouldin's hold on the anchor tenant, the center was lost; "[t]he trap is closed" testified Bouldin's expert. Bouldin's only option at that point was to settle with the lender the best it could.

In summary, the success of the strip center relied upon Bouldin's success at either refinancing with a permanent mortgage or selling the strip center. The ability to do either depended upon Bouldin's success in resolving quickly its dispute with Blockbuster and its success at keeping a hold on Blockbuster by avoiding a lease rescission. There was sufficient evidence in the record to show that Capshaw's conduct postponed the quick resolution of the Blockbuster suit because he agreed to a continuance necessitated by incomplete discovery; Capshaw missed several deadlines which resulted in a default judgment on liability issues; the default judgment wounded his client's position so that it was forced to negotiate with Blockbuster a month-to-month lease which could be rescinded with 90 days notice; and this loss of a hold on Blockbuster ruined Bouldin's ability to either obtain permanent financing or sell the property which caused Bouldin to default on his construction loan. Thus, there was sufficient evidence that Haynes & Boone's conduct was the producing cause of injury to Bouldin. This, of course, was not contested by Haynes & Boone. The question Haynes & Boone propounds is whether the contested damage elements were caused by Haynes & Boone's wrongful conduct.

■ Haynes & Boone claims that Bouldin should not have been awarded $1,087,800.18 which was the amount contributed by or on behalf of Bouldin as capital contribution to the shopping center. Haynes & Boone asserts the strip center was a bad investment with no hope of surviving so its measure of damage should be either the diminution of the value of the business as a whole or loss of profits, as the facts dictate.

First, we visit whether the strip center was a bad investment doomed to fail. Haynes & Boone points out that the strip center never made a profit at any time. The profit and loss statement for January 1, 1987 through December 31, 1987 showed a loss of $18,080.37 in real dollars. We think Haynes & Boone is overstating the severity of the financial picture. This loss is small compared to a $263,593.74 net operating income and the center's July 1988 $4.4 million appraisal.

Haynes & Boone's argument also ignores testimony concerning the nature of real estate development and financing. The developer obtains a short-term loan which allows him to take his construction idea to the completion stage. Once the project is complete, the developer generally either refinances with a permanent long-term mortgage or sells the project and pays off all obligations. In the case at hand, the developer had on two separate occasions earnest money contracts to sell the property. Had the second purchase been completed, Bouldin as developer would have suffered only a small loss during a downturn in the real estate market.

Haynes & Boone also points to foreclosure notices that were posted every month from December 31, 1987 through March 1988 as signs of financial doom. Bouldin's expert testified as to the significance of the postings. He explained that Bouldin's short-term development loan was for two years. The developer has several options once the note matures: (1) refinance as long-term mortgage; (2) refinance as mini-term loan, which is usually for five to seven years; (3) sell the project and pay outstanding debts; or (4) extend the maturity date of the development loan. The development loan matured May 1987. Bouldin negotiated an extension and modification of the note in late 1987. The bank subsequently posted foreclosure notices to protect its interests. There was no foreclosure, however, and a jury could assume this is so because an earnest money contract existed which gave hope of an impending sale of the strip center in which event the note would be satisfied. In conclusion, the foreclosure postings were merely a sign of impending financial doom if the strip center was not sold. The strip center was not sold because of Haynes & Boone's wrongful behavior.

Lastly, Haynes & Boone point to the loss of cash flow after April 1988 as evidence of financial inviability. After April 1988, several tenants either stopped paying rent or quit the premises thereby limiting rental income. Haynes & Boone claims that because this occurred before the July sanctions default, this proves financial inviability. Haynes & Boone's contention relies on a technicality

and ignores the impact of the first sanctions order on the confidence of the tenants regarding the strip center's viability. Belton testified that all of the tenants knew that Blockbuster was trying to rescind its lease. It is likely that the confidence of the other tenants concerning the financial viability of the strip center waned when Blockbuster, the anchor tenant, first won a default judgment on April 22, 1988. In fact, Blockbuster's intention to move from the strip center was evidenced by their new lease agreement signed on May 24, 1988 for a store only four blocks away. It is unlikely that the tenants' confidence was restored when Capshaw convinced the trial judge to reconsider her first sanctions order. Because the loss in rental income was more likely than not caused by Capshaw's behavior, the loss of rental income is not a reflection on the strip center's financial viability.

In conclusion, we find there was sufficient evidence to support that the strip center, absent the wrongful acts of Capshaw, was not a failed or failing business enterprise.

In attacking the capital contribution award, Haynes & Boone asserts that the proper measure for damages to an ongoing business, with investment in property and an active income and expense stream is either: (1) the diminution of the value of the business as a whole; or (2) loss of profits, as the facts dictate. *Cf. Nelson v. Data Terminal Sys., Inc.,* 762 S.W.2d 744, 748–49 (Tex. App.—San Antonio 1988; writ denied). They continue that Bouldin is not entitled to capital contributions unless and until it is shown that Bouldin has an equity interest in the business and that equity interest was diminished or destroyed. Even then, they argue, the "loss" would not necessarily match the capital contributions to the business; the loss would only be the diminution of the equity or the business value. *Sawyer v. Fitts,* 630 S.W.2d 872, 874 (Tex.App.—Fort Worth 1982, no writ).

By citing *Nelson v. Data Terminal Sys., Inc.,* Haynes & Boone would limit this court to breach of contract remedies under the DTPA. We reject this limitation. Legal malpractice is a tort. *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988). Additional-

ly, we find *Sawyer v. Fitts* is not dispositive since the plaintiff in that case did not seek damages under the DTPA and the plaintiff's recovery was limited by the pleadings. *Sawyer,* 630 S.W.2d at 875.

The amount of actual damages recoverable under the DTPA is determined by the total loss sustained as a result of the deceptive trade practice. *Kish v. Van Note,* 692 S.W.2d 463, 466 (Tex.1985). In DTPA cases, appellate courts have been flexible, approving various measures of damages to allow plaintiffs to recover the greatest amount of actual damages alleged and established by proof to have been factually caused by the defendant's conduct. *Brighton Homes, Inc. v. McAdams,* 737 S.W.2d 340, 342 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); *Woo v. Great Southwestern Acceptance Corp.,* 565 S.W.2d 290, 298 (Tex. Civ.App.—Waco 1978, writ ref'd n.r.e.). Indeed in some cases, compensating an injured consumer for his total loss may require combining several different measures of damages. *Mancorp, Inc. v. Culpepper,* 781 S.W.2d 618, 625 (Tex.App.—Houston [1st Dist.] 1989), *rev'd on other grounds,* 802 S.W.2d 226 (Tex.1990). A consumer's "net economic loss" has been recognized as a proper measure of compensation under the DTPA. *See Sam Montgomery Oldsmobile Co. v. Johnson,* 624 S.W.2d 237, 243 (Tex.Civ. App.—Houston [1st Dist.] 1981, no writ) (net loss included diminution in value plus lost rentals of motor home). In *Henry S. Miller Co. v. Bynum,* a consumer was entitled to his net capital loss which was the total amount of his loss, less the amount, if any, of any value received and retained. *Henry S. Miller Co. v. Bynum,* 797 S.W.2d 51, 54 (Tex.App.— Houston [1st Dist.] 1990), *aff'd,* 836 S.W.2d 160 (Tex.1992). Bynum received the amount he had been required to put into the lease venture (capital contribution), less the amount he had received from the venture. *Henry S. Miller Co.,* 797 S.W.2d at 54. This court will affirm the judgment as it compensates Bouldin for the total loss he sustained as a result of Haynes & Boone's deceptive trade practice.

But for Haynes & Boone's deceptive acts, Bouldin would have recouped most of its

capital contribution of $1,087,800.18. Thus, Bouldin is entitled to recoup the capital contribution it would have realized but for Haynes & Boone's deceptive acts. Had the $4.4 million earnest money contract been fulfilled, the sale, disregarding closing costs, would have yielded $4.25 million. The remaining note balance was $3.315 million. Thus, a sales profit of $935,000.00 would have been realized and Bouldin would have recouped most of its capital contribution.

Bouldin, however, may not be enriched by his judgment; he may only be made whole. Belton testified that he invested $1,087,800.18 in capital contributions and that if the $4.4 million earnest money contract[3] had been executed, Bouldin would have experienced some financial loss. Because Bouldin would have experienced some financial loss absent Capshaw's wrongful acts, it should not be entitled to recoup the entire capital contribution. The actual loss to Bouldin would have been $152,800.18. We calculate this as follows: $4.25 million (purchase price) − $3.315 million (note) = $935,000 (sales profit). $1,087,800.18 (capital contribution) − $935,000 (sales profit) = $152,800.18 (Bouldin loss). There is a complete absence of evidence supporting $152,800.18 of the capital contribution jury award. We render a take nothing judgment as to $152,800.18 of the $1,087,800.18 capital contribution award.

■ Haynes & Boone complains that Bouldin's recovery of $284,639.00 in lost Blockbuster rents is in error. Bouldin lost ownership of the strip center in January 1989. Blockbuster moved from the strip center March 1989. Blockbuster never missed a rental payment while it occupied its store in the strip center. Because Blockbuster always paid its rent while Bouldin had an ownership interest in the strip center, there is no evidence that Bouldin lost rental profits from Blockbuster. Further, Bouldin's theory of recovery asserts that the strip center would have been sold but for Haynes & Boone's wrongful acts. This theory assumes necessarily that Bouldin would have no rental entitlement after the buyer assumes ownership. Thus, Bouldin cannot assert a right to lost rental profits; lost rental profits is incongruous with its theory of recovery. Consequently, we render a take nothing judgment as to this amount.

■ Haynes & Boone contends the $60,000.00 sum paid by or on behalf of Bouldin in settlement of the note deficiency after foreclosure was an incorrect measure of damage. After Bouldin defaulted on the strip center development note, the bank sold the strip center for $950,000.00 at the foreclosure sale. Thus, a $600,000.00 note deficiency remained. Belton informed the lending bank in writing that he was facing personal bankruptcy. By estimating the money the lender was likely to receive from a bankruptcy proceeding, Belton negotiated a $60,000.00 settlement for the $600,000.00 deficiency. But for Haynes & Boone's deceptive acts, the bank would not have foreclosed on Bouldin. As discussed previously, had the earnest money contract been satisfied, a note deficiency would not have occurred. Because Capshaw's deceptive acts caused the foreclosure, the $60,000.00 paid to settle the deficiency is recoverable since the deficiency would not otherwise have existed; the amount would not have been owed but for Capshaw's wrongful acts. There is sufficient evidence supporting the $60,000.00 judgment.

■ Haynes & Boone contends that the $38,484.00 paid to settle the Blockbuster suit is not recoverable.[4]

Belton testified that under the Blockbuster settlement Bouldin was required to pay Blockbuster $67,282.47. According to the settlement agreement, the settlement amount was comprised of $42,282.47 for attorney fees and $25,000.00 for water damage.

3. We use the $4.4 million earnest money contract to determine damages rather than the $5.35 million earnest money contract because Haynes & Boone's wrongful conduct only caused the loss of the $4.4 million earnest money contract. Haynes & Boone's wrongful conduct occurred after the $5.35 million earnest money contract was terminated by the buyer.

4. In Haynes & Boone's first point of error, the law firm objects to the submission of this damage issue since it is an improper element of the measure of damages.

Belton further testified, however, that Bouldin ultimately settled with Blockbuster for $38,840.70.

There are several problems with this damage element. First, the damage element does not take into account the expense that would have been incurred to resolve the Blockbuster dispute absent any wrongful acts on behalf of Haynes & Boone. In his June 23, 1987 letter, Belton emphatically asserts that he will not settle with Blockbuster. Because there was no evidence that Blockbuster was willing to nonsuit Bouldin, the assumption is that the Blockbuster suit would have been litigated to a solution. The litigation expense necessary to try the Blockbuster dispute to conclusion should have been offset from the settlement damages. The proper measure of damages is the difference between the value of the settlement handled properly and improperly. *Heath v. Herron*, 732 S.W.2d 748, 753 (Tex.App.—Houston [14th Dist.] 1987, writ denied).

The second problem with the damage element lies in the remuneration for the water damage. In order to support a malpractice recovery against an attorney, it is necessary that the client establish that he had a meritorious defense to the suit filed by the opposing party. *Heath*, 732 S.W.2d at 753. Capshaw testified that Bouldin had defenses to all of Blockbuster's claims except the water damage. Thus, attorney error did not cause legal liability for water damage. There is no evidence that Bouldin's liability for water damage was caused by attorney error. Consequently, Haynes & Boone should not be held liable for the water damage.

These problems are complicated by the reduction of the original settlement amount to $38,840.70. There is no evidence in the record showing what percentage of the final settlement is for water damage versus attorney fees.

The jury was asked what "amounts of money and other consideration if any, [was] paid by or on behalf of Bowser Bouldin to Blockbuster Videos, Inc. and its attorneys in settlement of the Blockbuster suit." The jury's answer of $38,484.00 was supported by the evidence. Haynes & Boone, however, complains that this question should not have been submitted to the jury.[5] We agree. The amount of money finally paid by Bouldin to settle the Blockbuster suit should have been discounted by the amount of money required to settle or litigate the Blockbuster suit absent Haynes & Boone's deceptive acts. *See Heath*, 732 S.W.2d at 753. Thus, the amount of money awarded to Bouldin would not have included remuneration for water damage since attorney error did not cause legal liability for water damage.

We partially sustain Haynes & Boone's first point of error in accordance with this opinion. The second point of error is overruled.

■ A question that fails to guide the jury to a finding on any proper legal measure of damages is fatally defective. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex.1973). Consequently, remand for a new trial is required. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 166 (Tex.1982); *Jackson*, 499 S.W.2d at 90. A separate trial on unliquidated damages alone, however, may not be ordered if liabili-

---

**5.** Haynes & Boone preserved its jury charge error. First, Haynes & Boone objected to the charge and pointed out distinctly the objectionable matter and the grounds of the objection. Second, Haynes & Boone submitted a jury instruction, which was rejected by the court, that was in substantially correct wording:

*DEFENDANT'S REQUESTED
QUESTION NUMBER 6*

What sum of money, if any, if now paid in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Bowser Bouldin, Ltd. for damages, if any, sustained as a result of the negligence you found in response to Question __?

Answer in dollars and cents, if any.
Answer: $____

SPECIAL INSTRUCTION: In connection with this question, you are instructed you may find Bowser Bouldin, Ltd. was damaged only if you find that, but for the negligence, Bowser Bouldin, Ltd. would have paid Blockbuster less in settlement. If you so find, the amount is limited by the difference, if any, between what Bowser Bouldin, Ltd. would have paid Blockbuster in settlement, together with its attorney's fees in so doing, but for the negligence, and the amount Bowser Bouldin, Ltd. actually paid Blockbuster to settle, together with its attorney's fees in so doing.

ty is contested. TEX.R.APP.P. 81(b)(1); *Paragon Hotel Corp. v. Ramirez*, 783 S.W.2d 654, 662 (Tex.App.—El Paso 1989, writ denied). We remand the entire case because the damages are unliquidated and liability is contested.

The judgment is reversed and the cause remanded for a new trial. *See* TEX.R.APP.P. 81(b)(1).

### KNOWING CONDUCT

 Haynes & Boone claims that Jury Question 13 is erroneous because there is no evidence or insufficient evidence that any conduct of defendant, upon which additional damage liability is predicated, was committed knowingly. Haynes & Boone asserts that its conduct resulted from either misunderstanding, carelessness, or forgetfulness; Haynes & Boone did not act with actual awareness.

A consumer is entitled to additional damages if the trier of fact finds that the conduct of the defendant was committed knowingly. TEX.BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon Supp.1993). Paralleling the DTPA definition, the jury instruction defined knowingly as "actual awareness of the falsity, deception or unfairness of the act or practice giving rise to the consumer's claim. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness."

Capshaw knew the threat to Bouldin's financial security imposed by the Blockbuster lawsuit since it could jeopardize the sale of the strip center. Despite this knowledge, Capshaw initially postponed discovery which, consequently, forced him to postpone the final resolution of Blockbuster's claims because he was not prepared for trial. Belton testified that it was critical for Blockbuster to remain as the anchor tenant. Additionally, he testified that on three separate occasions he told Capshaw he was afraid he would "lose the center" if he lost Blockbuster as a tenant.

Blockbuster alleged that Capshaw was late filing requests for interrogatories that were due April 11. The date interrogatories were served on Capshaw was disputed. The affidavit of the delivery service employee said they were delivered during business hours on Friday while Capshaw claims that the date stamped on the interrogatories prove they were delivered on Monday. Capshaw, however, wrote his client stating that the interrogatories were due on April 11. Capshaw states he did so to allow plenty of time for their completion. Also, there was testimony that Capshaw told Belton to deliver his completed responses during a scheduled deposition on April 12. Belton testified that Capshaw had a lackadaisical attitude about completing the interrogatories, did not warn him about possible sanctions if they were delivered late, and never told him that he was not cooperating. There was testimony that the attorney is ultimately responsible for having interrogatories filed properly and timely. Blockbuster scheduled a sanctions hearing for failure to timely file the interrogatories.

Capshaw's secretary testified that she accidently missed the fiat and that was why the vacationing Capshaw missed the sanctions hearing. Capshaw was successful in getting the sanctions order reconsidered. A new prospective sanctions order was instituted. Capshaw signed the order, agreeing to its form. Judge Kilgarlin testified that the second sanctions order is impermissible under Texas law because it did not require another hearing to determine whether the first sanctions order had been satisfied. In his opinion, however, Capshaw waived error by agreeing to the form of the order. In chambers, Capshaw asked the judge to clarify if the $1500.00 imposed fine was levied because of his behavior or his clients. Haynes & Boone refused to pay the $1500.00 and insisted Belton pay it. Judge Kilgarlin testified that Haynes & Boone should have paid the $1500.00 since they got Bouldin in trouble.

Capshaw signed the new sanctions order but, according to him, did not retain a copy of it because the runner was in a hurry to return the order. Capshaw testified that Blockbuster never sent him a copy of the order. Despite the importance of the deadlines, Capshaw never attempted to get a copy of the order.

In a letter to Belton, Capshaw stated the specific due date for filing the interrogatories but did not mention the $1500.00 payment

deadline. Capshaw promised to send a copy of the order but he never did; the first time Belton saw the order was three days after the $1500.00 payment was due. During a June 29 meeting at Capshaw's office, Belton testified that he asked when the $1500.00 was due. Capshaw stated he did not know but that it could be paid directly to the plaintiff's attorney. Capshaw, on the other hand, testified that he told Belton during a June 22 telephone conference to pay the money by July 19th. Additionally, he testified that he told Belton during the June 29 meeting to pay by July 19th and that if he missed the deadline, the same thing would happen again. Capshaw testified that he noted the due date on his calendar as Belton watched, although Belton states that Capshaw consulted his calendar and no due date was listed. Capshaw says he had another conference call with Belton on July 9th, that Belton asked who to make the check out to, that Capshaw spelled the firm's name, and said let us get this payment out.

Evidence was introduced to challenge Capshaw's veracity. Capshaw testified that Belton told him that Belton owned Dale Enterprises. This testimony contradicts the answers to admissions which were signed by Capshaw. Additionally, there was evidence that Capshaw altered his time sheet for June 29, 1988 to delete potentially harmful information. It is clear that the jury resolved the credibility question against Haynes & Boone.

■■■ The jury is the exclusive judge of the facts proved, the credibility of the witnesses, and the weight to be given to their testimony. We cannot set aside their jury verdict merely because the jury could have drawn different inferences or conclusions. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796–97 (1951); *First Nat'l Bank of Kerrville v. Hackworth,* 673 S.W.2d 218, 222 (Tex. App.—San Antonio 1984, no writ). As a lawyer, Capshaw knew the importance of deadlines and yet continued to miss them. Capshaw also understood the devastating effect that the second sanctions order would have on his client. Despite this knowledge, Capshaw did not take steps to insure that deadlines were met. Additionally, reasonable inferences could be drawn from the evidence that Capshaw was fraudulently attempting to cover-up his mistakes. After reviewing the entire record, we find there is more than a scintilla of evidence supporting knowing conduct. Additionally, after considering and weighing all the evidence, we hold that the jury finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Haynes & Boone's third and fourth points of error are overruled.

### EXEMPLARY DAMAGES

■■■ Haynes & Boone contends the jury's award of $1.5 million in DTPA additional damages is not supported by factually sufficient evidence or is so against the great weight and overwhelming preponderance of the evidence as to be excessive.

■■■ DTPA additional damages, which are imposed to punish the wrongdoer and serve as an example to others, are punitive damages. *Pace v. State,* 650 S.W.2d 64, 65 (Tex.1983); *see Jamail v. Anchor Mortgage Servs., Inc.,* 797 S.W.2d 369, 372 (Tex.App.—Austin 1990), *writ denied,* 809 S.W.2d 221 (1991); *Ortiz v. Flintkote Co.,* 761 S.W.2d 531, 537 (Tex.App.—Corpus Christi 1988, writ denied).

"Exemplary damages must be reasonably proportioned to actual damages. There can be no set rule or ratio between the amount of actual and exemplary damages which will be considered reasonable. This determination must depend upon the facts of each particular case." *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981); *see also Plaza Nat'l Bank v. Walker,* 767 S.W.2d 276, 278 (Tex.App.—Beaumont 1989, writ denied) (DTPA case that applied *Kraus* rule). The ratio between exemplary and actual damages in the case at hand is basically one-to-one: the jury awarded $1,474,650.18 in actual damages and $1,500,000.00 in DTPA additional damages. The one-to-one proportion between actual and exemplary damages is clearly within the proscription of the DTPA: The trier of fact may award not more than three times the amount of actual damages in excess of $1,000.00 since the jury found the defendant's conduct was committed knowing-

ly. *See* TEX.BUS. & COM.CODE ANN. § 17.50(b) (Vernon Supp.1993).

■ We also look at other factors in order to determine whether the exemplary damage award is reasonable. Such factors include, (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety. *Kraus,* 616 S.W.2d at 910.

Haynes & Boone, in asserting that the additional damages are excessive, argues that there is a diminished need for exemplary damages in property damage cases. *See, e.g., Upham Gas Co. v. Smith,* 247 S.W.2d 133 (Tex.Civ.App.—Fort Worth 1952, no writ). We reiterate that the jury did not award the maximum allowable additional damage award: The jury awarded an exemplary to actual damage award of a 1:1 ratio whereas the jury could have awarded them up to a 3:1 ratio. We reject, however, Haynes & Boone's other assertions: the character of the conduct involved, at best, simple human oversight, carelessness, and misunderstandings; the result of wrongful conduct was only that the financial woes were played out under a slightly different scenario; and the public interest was not affected. Indeed it rightly offends the public sense of justice and propriety when a lawyer fails to represent zealously his client's interest by missing deadlines and by blaming others—the client, his secretary, the trial judge—for the lawyer's unconscionable conduct.

In considering the *Kraus* factors, there was sufficient evidence for the jury to reasonably draw the following inferences: Capshaw, as an officer of the court, made false representations to the court concerning the date that the interrogatories were hand-delivered; Capshaw breached his fiduciary duty to Bouldin by failing to obtain a copy of the second sanctions order, refusing to pay the $1500.00 sanctions fine, and by repeatedly missing deadlines; Capshaw tried to cover-up his mistakes and refused to take responsibility for his actions; and Haynes & Boone as employer should be punished for Capshaw's behavior to deter this behavior in the future since employers have the capacity to control this type of behavior.

■ The amount of exemplary damages to be awarded rests largely in the discretion of the jury; unless the award is so large as to indicate that it is a result of passion, prejudice, or that the evidence has been disregarded, the verdict of the jury is conclusive and will not be set aside as excessive. *Kraus v. Alamo Nat'l Bank,* 586 S.W.2d 202, 208 (Tex.Civ.App.—Waco 1979), *affirmed,* 616 S.W.2d 908 (Tex.1981). We find that punitive damages were reasonably proportioned to actual damages and that the jury's award was not so large as to indicate that it was a result of passion, prejudice, or that evidence was disregarded.

Because we rendered a take nothing judgment as to a substantial portion of the actual damages found by the jury, however, we are under an obligation to give consideration to the ratio between exemplary and actual damages as found by the jury when considering the excessiveness of exemplary damages. *See Southwestern Inv. Co. v. Neeley,* 452 S.W.2d 705, 708 (Tex.1970). We are reducing the actual damage judgment by $475,923.18 through take nothing judgments. The jury awarded a one-to-one actual to exemplary damage ratio. We will not, however, suggest a remittitur of additional damages because: (1) the ratio of actual to exemplary damages is within the one to three ratio proscribed by the DTPA; and (2) we have no indication that the jury intended its award to reflect a one-to-one ratio of actual to exemplary damages.

We overrule Haynes & Boone's fifth point of error.

■ Haynes & Boone also contends that the $1.5 million DTPA additional damage award violates due process under U.S. CONST. amend. XIV and TEX. CONST. art. I, §§ 13, 19 because the Texas system of imposing punitive damages fails to provide reasonable procedural safeguards to control jury discretion. Haynes & Boone finds fault with three separate phases of the trial: (1) jury instruction; (2) trial court review; and (3) appellate court review.

First, Haynes & Boone asserts the additional damage instruction fails to inform the jury of: (1) the State's goal in allowing additional damages; (2) the nature of additional damages; (3) the factors to consider; and (4) the jury's right not to award punitive damages.

Objections to the jury charge must be presented to the court in writing, or be dictated to the court reporter in the presence of the court and opposing counsel, before the charge is read to the jury; all objections not so presented shall be considered as waived. TEX.R.CIV.P. 272. A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. TEX.R.CIV.P. 274.

Haynes & Boone did not point out distinctly its constitutional objection with the additional damage instruction, either during the jury charge conference or in writing to the trial court. In fact, when discussing punitive damages on the negligence question during the jury charge conference, Haynes & Boone's attorney stated, "We don't have any constitutional objection in this case." Consequently, we hold that Haynes & Boone waived any constitutional error regarding the additional damage instruction.

■ Second, Haynes & Boone asserts that Texas law did not provide meaningful adequate review by the trial court of additional damages. According to Haynes & Boone, Texas law requires almost no review by the trial court because: (1) the trial court decides whether to submit the exemplary damage issue to the jury after performing a no evidence test; and (2) the trial court does not have to review the damage issue per a motion for new trial or a motion to modify, correct or reform a judgment. See TEX. R.CIV.P. 329b(c).

We disagree with Haynes & Boone's second assertion that its amended motion for new trial was overruled by operation of law, thereby avoiding trial court review. The record shows that Haynes & Boone requested the trial court to set a hearing on its amended motion for new trial on or before August 30, 1991. The fiat attests that the requested hearing was set for August 29, 1991. The trial court signed an order overruling

Haynes & Boone's motion for new trial on August 29, 1991; the order states that a hearing was held before the court ruled.

Haynes & Boone is correct that Texas procedure for reviewing punitive damage awards is not as extensive as Alabama procedure which the United States Supreme Court held satisfies the due process clause in *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). There is no indication from *Haslip,* however, that the United States Supreme Court will scrutinize each state's procedure with Alabama as the precise model. *Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085, 1099 (5th Cir.1991), cert. denied, — U.S. —, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992). In Texas, the trial court reviews punitive damage awards to determine if they are reasonably proportioned to actual damages which review relies on substantive standards enumerated in *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). *Glasscock,* 946 F.2d at 1098. Texas procedure provides adequate post-trial review by the trial court to assure punitive damages awards are reasonable and not the result of impermissible factors. *Glasscock,* 946 F.2d at 1099; *General Motors Corp. v. Saenz,* 829 S.W.2d 230, 241–42 (Tex.App.— Corpus Christi 1992, writ granted); *Shearson Lehman Hutton, Inc. v. Tucker,* 806 S.W.2d 914, 925 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.).

■ Haynes & Boone complains that Texas appellate review of punitive damages violates due process protections because: (1) the review should focus on whether the damage exceeds the amount that will accomplish the goals of punishment and deterrence rather than focusing on whether actual damages are reasonably proportioned to exemplary damages; and (2) the review should model Alabama procedure by utilizing a comparative analysis by comparing the amount of punitive damages awarded in similar cases against the defendant in similar cases.

First, we believe our review of additional damages which utilized the *Kraus* factors does consider whether the damage exceeds the amount that will accomplish the goals of punishment and deterrence. *See Fibreboard*

*Corp. v. Pool,* 813 S.W.2d 658, 686 (Tex. App.—Texarkana 1991, writ denied), *cert. denied,* —— U.S. ——, 113 S.Ct. 3037, 125 L.Ed.2d 724 (1993). Second, Texas appellate review of punitive damages satisfies due process without utilizing the Alabama comparative analysis. *Glasscock,* 946 F.2d at 1099. There is no indication from *Haslip* that the United States Supreme Court will scrutinize each state's procedure with Alabama as the precise model. *Glasscock,* 946 F.2d at 1099. Also, review of the jury's decision by the appellate court using the *Kraus* standards assures that the award is reasonable and not the result of impermissible factors. *Glasscock,* 946 F.2d at 1099; *Saenz,* 829 S.W.2d at 241–42; *K–Mart Corp. v. Pearson,* 818 S.W.2d 410, 417 (Tex.App.—Houston [1st Dist.] 1991, no writ); *see also General Chem. Corp. v. De La Lastra,* 815 S.W.2d 750, 760 (Tex.App.—Corpus Christi 1991), *rev'd in part on other grounds,* 852 S.W.2d 916, 925 (Tex.1993) (court did not address whether punitive award unconstitutional).

Haynes & Boone's sixth point of error is overruled.

## ATTORNEY'S FEES

■ Haynes & Boone complains that the trial court erred by failing to condition the appellate attorney's fee award upon an unsuccessful appeal by defendant.

The final judgment ordered Haynes & Boone to pay Bouldin $137,500.00 for attorney fees. The order further stated that $12,500.00 will be abated from this award if neither Haynes & Boone nor Bouldin files an application for writ of error in the Supreme Court of Texas. Additionally, the order will be abated an additional $25,000.00 if Haynes & Boone does not file a cost bond for appeal to the court of appeals of Texas.

■ A trial court may award appellate attorney's fees. *Rittgers v. Rittgers,* 802 S.W.2d 109, 115 (Tex.App.—Corpus Christi 1990, writ denied). It may not, however, penalize a party for taking a successful appeal by taxing him with attorney's fees should he take such action. *Rittgers,* 802 S.W.2d at 115; *King Optical v. Automatic Data Processing of Dallas, Inc.,* 542 S.W.2d 213, 218 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.); *contra Twin City Fire Ins. Co. v. Cortez,* 562 S.W.2d 940, 945 (Tex.Civ. App.—Amarillo 1978), *rev'd on other grounds,* 576 S.W.2d 786, 787 (Tex.1978) (attorney's fee was not before the court). The trial court must condition an appellate attorney's fee award upon the appellant's unsuccessful appeal; a trial court may not grant an unconditional award of appellate attorney's fees. *Rittgers,* 802 S.W.2d at 115; *Siegler v. Williams,* 658 S.W.2d 236, 241 (Tex.App.— Houston [1st Dist.] 1983, no writ).

The appellate attorney's fee award in the case at hand was not conditioned upon an unsuccessful appeal. The trial court's judgment pertaining to the award of appellate attorney's fees is reversed and rendered so that Bouldin take nothing. *See Rittgers,* 802 S.W.2d at 115 (party took nothing on punitive appellate attorney's fees); *King Optical,* 542 S.W.2d at 218 (punitive appellate attorney fee award deleted from judgment). We stress that the $100,000.00 award for the prosecution of the case is upheld.

Haynes & Boone's seventh point of error is sustained.

Our holding would require a reversal and rendering of a take nothing judgment as to: (1) $152,800.18 in capital contributions; (2) $284,639.00 in lost Blockbuster rents; (3) the $38,484.00 Blockbuster settlement cost; and (4) $37,500.00 of appellate attorney's fees. Our holding as to the $38,484.00 Blockbuster settlement, however, requires us to reverse and remand the entire case.

CHAPA and GARCIA, JJ., concur in the result.

## ORDER OF VOLUNTARY REMITTITUR

Appellee has filed with this court an amended offer of remittitur pursuant to Tex. R.App.P. 85(e). Because the voluntary remittitur cures the reversible error, appellee's offer is accepted as to the $38,484.00 Blockbuster settlement. We amend our original holding to read as follows: We reverse and render a take nothing judgment as to: (1) $152,800.18 in capital contributions; (2) $284,639.00 in lost Blockbuster rents; and (3)

$37,500.00 of appellate attorney's fees. As amended, the judgment of the trial court is affirmed.